## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MARY QUESENBERRY, et al.,** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:09cv00022** |
| | ) | |
| **VOLVO GROUP NORTH AMERICA,** | ) | **REPORT AND** |
| **INC., f/k/a VOLVO TRUCKS NORTH** | ) | **RECOMMENDATION** |
| **AMERICA, INC., et al.,** | ) | |
| **Defendants** | ) | |

The plaintiffs have brought a proposed class action against the defendants, under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that, under § 301 of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 185, Volvo cannot unilaterally terminate or modify retiree health care benefits provided for under collective bargaining agreements between Volvo and the UAW and Local 2069. The plaintiffs further seek a declaration that, under §§ 502(a)(1)(B) and (a)(3) of the Employment Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), Volvo cannot unilaterally terminate or modify retiree health care benefits provided under the Volvo Plan for the putative class representatives and those similarly situated. This case is currently before the court on the Defendants' Motion To Dismiss, Stay, Or Transfer Venue, (Docket Item No. 5), which was filed on February 2, 2009, and the Plaintiffs' Motion For Preliminary Injunction, (Docket Item No. 20), which was filed on February 16, 2009, ("the Motions.") Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331. The Motions are before the

undersigned by referral pursuant to 28 U.S.C. § 636(b)(1)(A).[1]

## I. Facts

The class representatives are all residents of the Commonwealth of Virginia residing in the Western District of Virginia.[2] They all were employed by Volvo at the New River Valley Assembly Plant, ("NRV Plant"), in Dublin, Virginia, until their respective retirement dates, ranging from 2000 to 2007. They all were members of a bargaining unit represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, ("UAW"), and UAW Local Union 2069, ("Local 2069").

Plaintiff UAW is a labor organization within the meaning of § 2(5)of the National Labor Relations Act, ("NLRA"), 29 U.S.C. § 152(5), which represents certain Volvo employees in collective bargaining. The UAW's principal offices are located in Detroit, Michigan. The UAW has negotiated a series of collective bargaining agreements with Volvo and its corporate predecessors, under the terms of which Volvo retirees and their spouses, surviving spouses and dependents are entitled to retiree health care benefits. Plaintiff Local 2069 is a labor organization within the meaning of § 2(5) of the NLRA, which represents in collective bargaining the

---

[1] By Standing Order 2006-05 entered August 29, 2006, all civil cases assigned to Senior United States District Judge Glen M. Williams are referred to the undersigned for full pretrial management, effective August 30, 2006.

[2] Mary Quesenberry lives in Abingdon, Virginia; Paul E. Hollandsworth lives in Floyd, Virginia; Walter E. Viers and Curtis L. Cox live in Draper, Virginia; Robert K. Goad lives in Dublin, Virginia; and Shirley I. Tolbert lives in Pulaski, Virginia.

-2-

employees of Volvo's NRV Plant. Local 2069 is located in Dublin, Virginia, within this judicial district. Local 2069 also is a party to the series of collective bargaining agreements with Volvo and its corporate predecessors mentioned previously. Defendant Volvo Group North America, Inc., f/k/a Volvo Trucks North America, Inc., ("Volvo"), is a Delaware corporation with its principal offices located in Greensboro, North Carolina. Volvo operates the NRV Plant located in Dublin, Virginia, within this judicial district. Volvo is an "employer" within the meaning of § 2(2) of the NLRA, 29 U.S.C. § 152(2), and § 3(5) of ERISA, 29 U.S.C. § 1002(5), as well as a "plan sponsor" and "administrator" within the meaning of § 3(16)(A)-(B) of ERISA, 29 U.S.C. § 1002(16)(A)-(B), of the Volvo Trucks North America Retiree Healthcare Benefit Plan, ("Volvo Plan"), through which the retiree health care benefits at issue in this litigation are provided. Volvo is sued in its capacities as a party to the collective bargaining agreements with the UAW that established its obligation to provide retiree health care benefits and as the plan sponsor and the plan administrator of the Volvo Plan.

Volvo informed the UAW and Local 2069 in January 2008 that, following the expiration of the collective bargaining agreement then in effect, it intended to "restructure" the plan of benefits provided to current retirees, surviving spouses and eligible dependents who were entitled to receive benefits under the Volvo Plan. Volvo and the UAW negotiated changes for medical benefits to be provided to active employees and to employees retiring on or after March 17, 2008. Volvo and the UAW did not reach an agreement on any changes in medical benefits to be provided to retirees whose retirement dates were before March 17, 2008, to surviving spouses of such retirees and to surviving spouses of UAW-represented employees who died

-3-

before March 17, 2008, while actively employed but after becoming eligible for a pension or for the dependents of any such retirees or surviving spouses. Nonetheless, Volvo announced in a notice that it sent to members of the putative class on or about December 31, 2008, that it would unilaterally change their health care benefits effective March 1, 2009. These changes would require retirees who were not yet eligible for Medicare to begin paying monthly premiums in order to continue receiving benefits and to pay significantly greater deductibles, copayments and coinsurance than they had to date been required to pay. Retirees who were eligible for Medicare would be forced into a Medicare Advantage program, under which they would not receive the same benefits that they are entitled to receive under the collective bargaining agreements and under which, in many cases, would require payment of significantly higher deductibles, copayments and coinsurance than they had to date been required to pay.

On January 21, 2009, the plaintiffs filed this action seeking declaratory and injunctive relief. Three weeks previously, on December 31, 2008, the day Volvo sent the notice to the retirees of the planned "restructuring" of the benefit plan, the defendants filed a nearly identical cause of action seeking declaratory relief in the United States District Court for the Middle District of North Carolina, in Greensboro, North Carolina, ("the North Carolina Action").[3]

The defendants argue that the "first-to-file" rule should apply, and they ask the

---

[3]In *Volvo v. UAW*, 1:08cv00940 (M.D.N.C. Dec. 31, 2008), Volvo seeks a declaratory judgment that the proposed changes do not violate the retirees' rights to health care benefits under the collective bargaining agreements. Volvo also seeks a declaratory judgment that the proposed changes do not violate its fiduciary duties as plan administrator.

-4-

court to dismiss, stay or transfer the case to the Middle District of North Carolina to be consolidated with the first-filed action. Aside from the first-to-file rule, the defendants argue that transferring the case to the Middle District of North Carolina for consolidation would promote the convenience to the parties and witnesses and would promote the interest of justice. The plaintiffs argue, to the contrary, that venue is not proper in the Middle District of North Carolina. They further argue that, even if this court should find that such venue is proper, transfer to the Middle District of North Carolina would be inconvenient to the parties and witnesses and would not promote the interest of justice. They note that the defendants in the North Carolina Action have filed a motion to dismiss for failure to state a claim, lack of personal jurisdiction, lack of subject matter jurisdiction and improper venue.

## II. Analysis

### A. Motion To Dismiss, Stay, Or Transfer Venue

#### 1. First-to-File Rule

The parties do not dispute that the same parties in interest are involved in both suits, they both seek certification of the same class, the causes of action are the same and both seek declaratory relief on the same issue. The defendants contend that because Volvo filed its action first in the Middle District of North Carolina, the "first-to-file" rule supports dismissing, staying or transferring this action to the Middle District of North Carolina for consolidation with the pending suit there. As the defendants explain in their brief, the policy underlying the first-to-file rule is "the

-5-

avoidance of duplicative litigation and the conservation of judicial resources." *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006) (citing *Samsung Elecs. Co., Ltd. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 724 (E.D. Va. 2005)). The defendants contend that allowing the suit to proceed in this court would result in duplicative proceedings and would waste judicial resources.

While it is true that, ordinarily, when multiple suits are filed in different federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed, *see Allied-Gen. Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.1 (4th Cir. 1982) (citing *Carbide & Carbon Chems. Corp. v. U.S. Indus. Chems., Inc.*, 140 F.2d 47, 49 (4th Cir. 1944)); *see also Hop-In Food Stores, Inc. v. S&D Coffee, Inc.*, 642 F. Supp. 1106, 1107 (W.D. Va. 1986), this rule is not to be mechanically applied, however. Quite recently, the Fourth Circuit in *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594-95 (4th Cir. 2004), stated that "the first suit should have priority, *absent the showing of balance of convenience in favor of the second action*." (quoting *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974) (internal quotation marks and citations omitted) (emphasis added)). Thus, the court must balance the convenience between the two actions before deciding whether application of the first-to-file rule is appropriate in a given situation. Moreover, as the plaintiffs note in their opposition brief, courts have held that a departure from the first-to-file rule might be warranted in situations involving bad faith, such as where the first suit was filed in an attempt to preempt an inevitable action or for the purposes of forum shopping. *See Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d 888, 901 (D. Md. 2008); *Touchstone Research Lab, Ltd. v. Anchor Equip. Sales, Inc.*, 294 F. Supp.

-6-

2d 823, 826 (N.D. W.Va. 2003). The plaintiffs allege that both are the case here.

To support their claim that Volvo was attempting to preempt a coercive action by them, the plaintiffs correctly note that Volvo filed the North Carolina Action the very same day that the notice of its restructuring plan was mailed to the retirees. That being the case, the plaintiffs argue that the defendants' actions deprived them of any opportunity to bring a coercive action before filing its own declaratory judgment action. The plaintiffs further contend that Volvo's actions evidence forum shopping and an attempt to strip the "natural plaintiffs" of their choice of forum. In *Hipage Co., Inc. v. Access2Go, Inc.*, 589 F. Supp. 2d 602, 616 (E.D. Va. 2008) (quoting *Publ'ns Int'l, Ltd. v. McRae*, 953 F. Supp. 223, 224 (N.D. Ill. 1996)), the court stated that the prevailing view is "not to give the alleged wrongdoer a choice of forum." While the court reserves making a decision on whether Volvo did, in fact, file the North Carolina Action in an effort to preempt any coercive action by the plaintiffs and/or in an attempt to forum shop, the facts put before the court could lead to such an inference.

Next, the plaintiffs' argument that the first-to-file rule need not be applied when the first-filed case is no further developed than one subsequently filed is well-taken. *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 21, (1983) (applying the *Colorado River*[4] doctrine because the first action was filed in federal court, while the second action was filed in state court). Although complaints and motions to dismiss have been filed in both cases as of the date of the plaintiffs' brief in opposition, Volvo also has filed an answer in this action. Furthermore, the plaintiffs have filed, and argued, their Motion For Preliminary Injunction. Thus, it cannot be

---

[4]*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

Case 1:09-cv-00022-JPJ-PMS   Document 38   Filed 03/10/09   Page 7 of 36   Pageid#: 937

argued that the first-filed North Carolina Action has progressed further than the action before this court. Lastly, courts within the Fourth Circuit have held that a rigid application of the first-to-file rule is unwarranted when the second action was filed only weeks after the first action. *See Affinity Memory & Micro, Inc. v. K & Q Enters., Inc.*, 20 F. Supp. 2d 948, 955 (E.D. Va. 1998) (holding that the first-to-file rule did not apply when the second action was filed two weeks after the first action). Here, the plaintiffs filed their action in this court exactly three weeks after Volvo filed the North Carolina Action.

For all of the above-stated reasons, the court finds that the application of the first-to-file rule is not appropriate given the facts of this case. That being the case, I recommend that the court not dismiss or stay this proceeding.

### 2. Request to Transfer Venue

Pursuant to 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district or division where it might have been brought for the convenience of the parties and witnesses and in the interest of justice. The purpose of this change of venue statute is to "prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Continental Grain Co. v. Barge F.B.L.-585*, 364 U.S. 19, 26, 27 (1960)). However, the court first must determine whether the proposed transferee district is one where the action might have been brought before turning its attention to the balancing of the other relevant factors. The parties do not dispute that this action could have been brought in the Middle

District of North Carolina.  Specifically, the Middle District of North Carolina would have subject matter jurisdiction over the action because the plaintiffs have asserted federal questions under the LMRA and ERISA.  Moreover, the Middle District of North Carolina would have personal jurisdiction over Volvo because it is headquartered in Greensboro, which is located in the Middle District of North Carolina.  That being the case, it is clear that Volvo has systematic and continuous contacts there.  Personal jurisdiction also would exist over the Volvo Plan because it is administered in Greensboro.

Venue also would be proper in the Middle District of North Carolina.  Pursuant to 28 U.S.C. § 1391, the general venue statute:

> ... A civil action wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C.A. § 1391(b) (West 2006).  For purposes of the general venue statute, a corporate defendant such as Volvo is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. *See* 28 U.S.C. § 1391(c) As already discussed, Volvo is subject to personal jurisdiction in the Middle District of North Carolina.  Therefore, venue is appropriate there.

Under 28 U.S.C. § 1404(a), a district court has the authority to transfer an

action "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where [the action] might have been brought." The decision to transfer venue falls within the broad discretion of the district court. *See Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1257 (4th Cir. 1991) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). When determining whether a transfer of venue is justified, there are a number of relevant factors that the district court should consider, including the plaintiff's choice of venue, witness convenience and access, party convenience and the interest of justice. *See Bd. of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1256-61 (E.D. Va.1988). Courts have noted that great weight shall be given to the plaintiff's choice of forum. *See Collins v. Straight, Inc.*, 748 F.2d 916, 921-22 (4th Cir. 1984) (stating that "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") (quoting *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1946)); *see also Ellicott*, 502 F.2d at 180; *Glamorgan Coal Corp. v. Ratners Group, PLC*, 854 F. Supp. 436, 437 (W.D. Va. 1993) (holding that "plaintiff's choice of forum is entitled to a degree of deference especially when ... it chooses to file suit in the district and division in which it resides.") (citations omitted). This court has stated that the burden is upon the movant "to disturb the plaintiff's choice of forum by showing that 'the balance of equities is in their favor [and] that judicial economy and convenience to all parties favor suit in another forum.'" *Glamorgan Coal Corp.*, 854 F. Supp. at 437-38 (quoting *Eldridge v. Bouchard*, 620 F. Supp. 678, 684 (W.D. Va. 1985)).

Although the plaintiff's choice of forum is ordinarily to be given great weight, a district court also must consider the factors of witness convenience and access, party

-10-

convenience and the interest of justice. Thus, in an effort to properly determine whether a motion to transfer venue should be granted, the court should examine the facts and circumstances on a case-by-case basis to ensure that each case is thoroughly evaluated based upon fairness and convenience.

In its Motion To Dismiss, Stay, Or Transfer Venue, the defendants request that this court transfer this case for consolidation with the North Carolina Action pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses and in the interest of justice. The defendants argue that feasibility of consolidation is a significant factor in a transfer decision. In this vein, they argue that because the parties in interest to this action and those in the North Carolina Action are nearly identical and seek resolution of identical questions of law, the actions should be consolidated pursuant to Federal Rule of Civil Procedure 42.[5] The defendants contend that because consolidation is highly feasible, it is in the interest of justice to transfer the case to the Middle District of North Carolina. The plaintiffs argue, on the other hand, that consolidation is not feasible because substantial defects exist in the North Carolina Action. Specifically, the plaintiffs emphasize that the UAW and Local 2069 have moved to dismiss the North Carolina Action for failure to state a claim, lack of subject matter jurisdiction, lack of personal jurisdiction and for improper venue. The plaintiffs have attached this motion to dismiss to their brief in opposition, and the court has reviewed the arguments for dismissal contained therein. Without analyzing in detail those arguments, the undersigned finds that the district court in North Carolina could rule in favor of the UAW and Local 2069, dismissing some or all of

---

[5]Federal Rule of Civil Procedure 42 states that "[i]f actions before the court involve a common question of law or fact, the court may ... consolidate the actions." FED. R. CIV. P. 42(a)(2).

Case 1:09-cv-00022-JPJ-PMS    Document 38    Filed 03/10/09    Page 11 of 36    Pageid#: 941

Volvo's claims.  That being said, the court finds that it is not feasible to consolidate this action with the North Carolina Action, at least not during the pendency of the UAW's and Local 2069's motion to dismiss.

Additionally, the undersigned finds that the convenience of the parties and witnesses does not tip in favor of transferring the action to the Middle District of North Carolina.  The defendants argue that any weight that normally should be given to the plaintiffs' choice of forum is diminished, given that this is a class action.  In particular, they contend that the bulk of the work will be conducted by the UAW and Local 2069, not the individual class representatives, many of whom, they concede, live in this judicial district.  In any event, the defendants argue that even if the class representatives have more than minimal involvement, the Middle District of North Carolina is not necessarily an inconvenient forum because most of the class representatives live approximately 100 miles from Greensboro.  The court notes, however, that while the bulk of the work might not be conducted by the class representatives, it would not be uncommon for these individuals, as well as class members, to desire being present during the various court proceedings.  Moreover, as evidenced by various declarations attached to the plaintiffs' opposition brief, many of these class representatives and class members are older or elderly, they are in poor health and are living on fixed incomes, thereby making it very difficult, if not impossible, to travel the approximately 100 miles to Greensboro to attend court proceedings.  The plaintiffs have presented evidence that a great majority of the putative class of retirees lives in the Western District of Virginia.  The plaintiffs argue that the fact that a significant percentage of the putative class is elderly and on fixed incomes with ever-increasing medical needs underscores the fact that these individuals

-12-

have an unsurpassed interest in the outcome of a suit to determine their rights to health care benefits. However, as previously discussed, traveling to the Middle District of North Carolina would either impose a great hardship on them or would make it impossible for them to attend court proceedings.

On the other hand, the plaintiffs argue that a large corporation such as Volvo could, and does, litigate all around the country. Furthermore, they argue that Volvo would not suffer any great inconvenience by defending a suit in a judicial district where it normally conducts business operations.

The defendants first argue that convenience to the parties and witnesses tips in favor of transfer because Volvo is headquartered in Greensboro, and the Volvo Plan is administered there as well. That being the case, the defendants argue that its witnesses, information about the decision to change benefits, the administration of the Volvo Plan generally and various documents relating to negotiations can be found there. The defendants note that, while the UAW may have witnesses and information located in Detroit, the difference between the distance to Greensboro, North Carolina, which is 621 miles, and Abingdon, Virginia, which is 558 miles, is nominal. The defendants further argue that the individuals involved in the contract negotiation process and capable of testifying to the discussions in negotiations are Kaye McLeod, head of benefits for Volvo and chief spokesperson for Volvo with respect to benefits negotiations concerning the NRV Plant, and William Waters, head of Volvo's labor relations and the chief spokesperson for Volvo in labor negotiations with the UAW, both of whom are located in Greensboro. While Volvo concedes that it is unable to state its entire case and potential witnesss at this stage in the litigation, it is certain that

-13-

key witnesses will be located in or significantly closer to the Middle District of North Carolina than to this district. For all of these reasons, the defendants argue that the convenience of witnesses factor favors transfer to the Middle District of North Carolina.

In addition to the plaintiffs' already-recited arguments, declarations from all of the putative class representatives state that they agreed to be plaintiffs in a lawsuit against Volvo with the understanding that the suit would be filed in this district, where they and almost all of the NRV Plant retirees live. These class representatives also have stated in their declarations that they believe that the other retirees would find it unfair for their rights to retiree health care benefits to be decided in North Carolina. The plaintiffs also point out that Local 2069, which also is located in Dublin, Virginia, would prefer to litigate in this district. A declaration submitted by John E. Sayers, the appointed benefits representative of Local 2069, states that Local 2069 performs most of its activities representing employees at the NRV Plant in and around Dublin, Virginia, and it keeps its records in Dublin, Virginia. The plaintiffs note the defendants' failure to discuss the convenience of any retiree witnesses who will testify to their understanding of the benefits plan. The plaintiffs state that retirees are expected to testify about promises made by Volvo or its predecessor. As already explained, a large majority of those retirees live in this district. Moreover, all of Local 2069's primary witnesses to relevant negotiations live in this district. In his declaration, Sayers states that he considers the primary witnesses to relevant negotiations to be Don Ratcliff, Gary Hamrick, the current bargaining chairman for Local 2069, and himself. Sayers further states that all of these individuals live in the Western District of Virginia. Moreover, he states in his declaration that approximately

-14-

39 former negotiators presently live in the Western District of Virginia. Sayers further states that substantially more than half of these individuals are retired and some are elderly. Sayers states that a very large majority of the UAW-represented retirees from the NRV Plant live in the Western District of Virginia, noting that perhaps only six live in other states. Next, the plaintiffs note that Volvo can require its employees, such as Kaye McLeod and William Waters, to attend court proceedings without any compulsion by the court. However, the plaintiffs likely will require the testimony of retirees and Volvo management personnel at the NRV Plant, such as Bruce Jennings, who participated for the employer in every round of bargaining. However, those potential witnesses who live near the NRV Plant could not be compelled to attend proceedings in Greensboro pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(ii).[6]

Finally, despite the plaintiffs' concession that many documents relating to relevant negotiations are located at Volvo's headquarters and UAW's headquarters, they argue that this would not shift the balance toward litigating in the Middle District of North Carolina because, in modern litigation, documentary evidence is readily reproduced and transported from one district to another. *See Generac Corp. v. Omni Energy Sys., Inc.*, 19 F. Supp. 2d 917, 923 (E.D. Wis. 1998). The court accepts this argument without further discussion.

In conclusion, it is apparent to the court that this case should not be transferred

---

[6]Federal Rule of Civil Procedure 45(c)(3)(A)(ii) states that, on timely motion, the issuing court may quash or modify a subpoena that requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed or regularly transacts business in person. FED. R. CIV. P. 45(c)(3)(A)(ii).

for consolidation with the North Carolina Action. Virginia is a more convenient location for most potential witnesses. The court recognizes that the decision not to transfer venue may be inconvenient to Volvo. Nonetheless, based upon a consideration of the relevant factors and a balancing of the equities, I am of the opinion that, in the interest of fairness and judicial convenience, this matter should not be transferred to the Middle District of North Carolina.

### B. Motion For Preliminary Injunction

The plaintiffs also have filed a Motion For Preliminary Injunction, (Docket Item No. 20), to enjoin the defendants from proceeding with the proposed restructuring of the retiree health care benefit plan until the court can determine whether Volvo would violate its statutory obligations under the LMRA and ERISA by unilaterally changing the terms of the proposed class members' health benefits coverage. The court heard argument on the motion for a preliminary injunction on February 27, 2009. Based on the parties' representations and arguments submitted to the court, the undersigned finds that the issuance of a preliminary injunction is not appropriate for the following reasons.

The purpose of a preliminary injunction is "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003) (citing *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)). In determining whether preliminary injunctive relief is appropriate, the Fourth Circuit has long employed the

-16-

"hardship balancing test" set forth in *Blackwelder Furniture Co. of Statesville, Inc. v. Selig Mfg. Co., Inc.,* 550 F.2d 189, 195 (4th Cir. 1977). Specifically, under *Blackwelder* and its progeny, in granting preliminary injunctive relief, the courts considered the following four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the preliminary injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *See* 550 F.2d at 195-96; *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811-12 (4th Cir. 1991). Under *Blackwelder*, if the plaintiff made a clear showing of irreparable injury, the court next balanced the likelihood of irreparable harm to the plaintiff resulting from the failure to grant the interim relief against the likelihood of harm to the defendant resulting from the grant of such relief. *See Direx Israel*, 952 F.2d at 812 (citing *Blackwelder*, 550 F.2d at 195). If the balancing of these two factors "tips decidedly" in favor of the plaintiff, a preliminary injunction would be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Rum Creek Coal Sales, Inc., v. Caperton,* 926 F.2d 353, 359 (4th Cir. 1991) *as quoted in Direx Israel*, 952 F.2d at 812-13. Moreover, as the balance tipped away from the plaintiff, a stronger showing on the merits was required. *See Rum Creek*, 926 F.2d at 359 (citation omitted). When the hardship balance did not tip decidedly or significantly in favor of the plaintiff, a probability, not a mere possibility, of success of the ultimate trial on the merits was required to establish likelihood of success on the merits. *See Direx Israel*, 952 F.2d at 813 (citing 2 McCarthy on Trademarks and Unfair Competition, § 30.16, 485-86 (2d ed. 1980)).

-17-

In November 2008, the Supreme Court set forth a somewhat revised standard to be used in determining when the grant of preliminary injunctive relief is appropriate. *See Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). Earlier this year, the Fourth Circuit employed this revised standard in *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, (4th Cir. 2009). This revised test requires the court to consider the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities between the parties; and (4) the public interest. *See Musgrave*, 553 F.3d at 298 (citing *Winter*, 129 S. Ct. at 374). As the plaintiffs explain in their brief, the *Winter* standard condenses *Blackwelder's* implied "balance of harms" inquiry into its third factor. *See* 550 F.2d at 196. In *Musgrave*, the Fourth Circuit held that in order to receive a preliminary injunction, "a plaintiff 'must establish that he is likely to succeed on the merits. ...'" 553 F.3d at 298 (quoting *Winter*, 129 S. Ct. at 374).

While neither court in *Musgrave* or *Winter* elaborated on what is meant by being "likely to succeed on the merits," injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 376. It also is well-settled that it is the "[p]laintiff [who] bears the burden of establishing that each of the factors supports granting the injunction." *See Direx Israel*, 952 F.2d at 812 (quoting *Technical Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)). That being the case, it appears that under standards set forth in *Winter* and employed in *Musgrave*, the plaintiff must, at the very least, show that success on the merits is more likely than not.

-18-

The plaintiff also must make a clear showing of the likelihood of irreparable harm if the desired preliminary injunction is not granted. *See Direx Israel*, 952 F.2d at 812. Moreover, the required irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel*, 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)); *see ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (holding that establishing a risk of irreparable harm is not sufficient, but plaintiff has the burden of proving a "clear showing of immediate irreparable injury").

### 1. Likelihood of Success on the Merits

The ultimate issue in this case is whether the relevant collective bargaining agreements in effect at the time the putative class members retired created vested health care benefits. The plaintiffs claim that the retiree health care benefits promised to the class members in the relevant collective bargaining agreements cannot be changed unilaterally by Volvo and that do to so would constitute violations of the LMRA and ERISA. Volvo argues that all collective bargaining agreements that promised health benefits to retirees and dependents have expired and no longer create binding obligations on Volvo to provide any health care benefits to any employees who retired prior to February 1, 2008.

Contractual obligations under a collective bargaining agreement, in the ordinary course, will cease upon termination of the bargaining agreement. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991). Vested benefits, however, are not affected by the subsequent expiration of a collective bargaining agreement. *See Litton*

-19-

*Fin. Printing Div.*, 501 U.S. at 207  (stating that "[r]ights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement"). Whether benefits promised in a collective bargaining agreement survive the termination of that agreement depends upon the intent of the parties as expressed in their agreement. *See Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 62 (4th Cir. 1989) (citing *District 29, United Mine Workers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985)). The question is primarily one of contract interpretation. *See Keffer,* 872 F.2d at 62 (citing *Royal Coal*, 768 F.2d at 590). Furthermore, in order to interpret a collective bargaining agreement, "it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Keffer*, 872 F.2d at 62 (quoting *Transp.-Commc'n Employees Union v. Union Pacific R.R. Co.*, 385 U.S. 157, 161 (1966).

As with any contract interpretation, the court must first look at the language of the agreement for any "clear manifestation of the parties' intent." *Keffer*, 872 F.2d at 62 (citing *Royal Coal*, 768 F.2d at 590).  Moreover, the document should be read as a whole, giving effect to all of its parts and reading related documents together.  *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005); *see also Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999).  There are no specific words that must be contained in an agreement in order for the court to find that benefits were vested.  Instead, the relevant question is whether the parties intended for the benefits to vest.  *See Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1519 (8th Cir. 1988). Furthermore, ERISA does not require vesting of health care benefits plans. *See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 515 (1997). Because employers are not legally

-20-

required to vest such benefits, the intention to vest must be found in "clear and express language." *Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 855 (4ᵗʰ Cir. 1994). It also is important to note that the plaintiffs bear the burden of proving that their health insurance benefits have vested. *See Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.*, 122 F.3d 228, 231 (5ᵗʰ Cir. 1997) (citing *Anderson,* 836 F.2d at 1517).

### a. Retirees Who Retired Prior to February 1, 2005

The plaintiffs claim that certain healthcare benefits vested for employees who retired prior to the expiration of the parties' 1999 Collective Bargaining Agreement, ("CBA"). Thus, the court's analysis must begin with the language of the agreement. Both the 1994 and the 1999 CBA contain the following language:[7] "[c]overage under health, dental, and the prescription drug programs will be continued into retirement with Volvo Trucks North America making the full contribution." The CBAs further state: "[t]he surviving spouse and eligible dependents of a retiree or a pension-eligible employee are fully covered under the health, dental and prescription drug programs at no cost." The plaintiffs note that while many other provisions included in the 1994 and 1999 CBAs contained explicit language limiting some employer obligations to the "term" or "life" or "period" of the agreement, the provisions requiring Volvo to continue health care benefits for retirees contains no such limitations.

The plaintiffs also note that the agreements contain no statement that a retiree's

_____

[7]The parties have not provided the 1994 CBA for the court's review. The parties, however, agree that the relevant language in the 1994 CBA is identical to the language in the 1999 CBA, which has been provided for the court's review.

benefits could be reduced or terminated upon the expiration of the collective bargaining agreement, no clause reserving to Volvo a right to make unilateral changes in retiree benefits and no clause reserving to Volvo and the UAW a joint right to negotiate reductions in benefits for employees who have previously retired. That being the case, the plaintiffs contend that Volvo's obligation to provide medical benefits after an eligible employee's retirement is unqualified.

The Fourth Circuit in *Keffer*, 872 F.2d at 63, affirmed a district court's finding that agreements that limited other benefits to the life of the agreement, but provided for a retiree's medical coverage to continue until Medicare eligibility "can only be rationally interpreted as contractually obligating [the employer] to provide the [r]etirees' medical coverage beyond the expiration of the collective bargaining agreement." The Fourth Circuit in *Keffer,* however, based its finding not only on the language contained in the agreement. The Fourth Circuit found that the context in which retiree health care benefits had been negotiated supported the conclusion that they were intended to continue beyond the agreement's expiration. *See Keffer*, 872 F.2d at 64.

The language contained in the 1999 CBA, stating that benefits for retirees, surviving spouses and dependents "will be continued" "at no cost" or "with Volvo Trucks North America making the full contribution" is similar to language that other courts have found to unambiguously create vested benefits. For instance, the Sixth Circuit in *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 248 (6th Cir. 1996), found that the language "[w]hen you are retired, your Health Care coverages, except for vision, are continued without cost to you" demonstrated an intent to vest benefits. The Sixth

Circuit held similarly in *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir. 1989), that the language "[b]enefits will continue for retiree" supported a decision that the retiree benefits had vested. On the other hand, other courts have ruled that similar language was ambiguous, requiring the consideration of extrinsic evidence to discern the parties' intent. *See Keffer*, 872 F.2d at 64 (court looked not only to language of agreement, but also to conduct of parties); *Bland,* 401 F.3d at 785-87 (language that "coverage remains in effect as long as you are living" is ambiguous); *Masonite,* 122 F.3d at 231-33 (language that retirees "will be entitled" to insurance benefits "until ... death" found ambiguous).

While not explicitly stating so, it appears the plaintiffs concede that the court must look beyond the language of the 1999 CBA to determine the parties' intent. In particular, the plaintiffs argue that the legal context in which retiree health benefits were negotiated supports a finding that they were intended to continue beyond the agreement's expiration. Specifically, they contend that such benefits typically are viewed as a form of delayed compensation or reward for past services and, therefore, would not be left to the contingencies of future negotiations. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). The plaintiffs have offered evidence that a number of the class members in this case understood that they were giving up wage increases in exchange for health benefits after retirement and that such benefits would continue for their and their dependents' lifetimes. The plaintiffs further contend that the fact that the 2005 Benefits Agreement imposed no increased health care costs on retirees who had retired under the earlier agreements, while significantly increasing such costs for active employees and employees who retired during the term of the 2005 Agreement,

-23-

evidences that the prior retirees' benefits had vested.

The defendants argue that the Fourth Circuit requires that in order to make a claim for vested retiree medical benefits, the party requesting such benefits must come forward with a clear and express statement providing for vested retiree medical benefits. *See Gable,* 35 F.3d at 855. Because vested retiree medical benefits constitute "extra - ERISA commitments," the defendants argue, "courts may not lightly infer the existence of an agreement" to vest them. *Gable*, 35 F.3d at 855. The defendants argue that the language of the 1999 CBA does not clearly and expressly provide for vested retiree medical benefits. Therefore, the defendants argue that the court must consider extrinsic evidence of the parties' intent. The defendants also argue that the parties have negotiated and implemented benefit changes that applied to existing employees in the past, despite similar language in earlier collective bargaining agreements. The defendants also have presented evidence that despite identical language in the 1994 CBA, the parties negotiated and agreed on a retiree health care liability cap when negotiating the 1999 CBA. Under this agreement, the cap was to become effective one year beyond the expiration of the 1999 CBA and would apply to both current and future retirees.

The defendants also argue that the parties' actions subsequent to the 1999 CBA shows that they did not intend to create vested health care benefits for employees retiring under the 1999 CBA. In particular, the defendants have presented evidence that the parties negotiated and agreed upon the inclusion of language in the 2005 Benefits Agreement, which limited the duration of medical benefits for "current retirees and future retirees" to the term of the collective bargaining agreement.

-24-

Furthermore, in 2005 the parties also negotiated and put in place a system by which the defendants could unilaterally impose additional contributions for health care benefits on existing retirees.

Based on my review of the 1999 CBA language, I find that it is ambiguous and, therefore, the court must look to extrinsic evidence to determine the parties' intent. As stated above, the 1999 CBA states: "Coverage under the health, dental, and the prescription drug programs will be continued into retirement with Volvo Trucks North America making the full contribution." Also, "The surviving spouse and eligible dependents of a retiree or a pension-eligible employee are fully covered under the health, dental and prescription drug programs at no cost." While it may be argued that this language, standing alone, means that these benefits would be available to retirees and their dependents at no cost, when viewed in the context of the entire collective bargaining agreement, it is clear that these benefits were never intended to be available at no cost. The Benefits Section of the 1999 CBA lists a number of costs to employees, retirees, spouses and dependents associated with their health, dental and prescription drug programs, including deductibles, co-pays and limitations on coverage. Furthermore, the entire health benefits plan is set up as a section of a collective bargaining agreement which had a clear expiration date of January 31, 2005. That being the case, I find that the language of the contract is ambiguous. Therefore, the court must turn to extrinsic evidence to determine the parties' intent.

Based on the extrinsic evidence presented to the court at this stage, I cannot determine that the plaintiffs have met their burden of showing a likelihood of success on the merits. The plaintiffs have offered evidence from several retirees who claim

they "understood" that under the 1999 CBA they were being provided lifetime health benefits. The plaintiffs have not, however, produced any evidence to show why these plaintiffs reached this understanding. They have produced no evidence of representations from the employer or union representatives which led them to this conclusion. They also have not produced any evidence from any of the union negotiators as to the parties' intentions. Furthermore, the defendants have produced evidence that despite similar language in previous agreements, the union continued to negotiate over retiree benefits it now claims were vested. That being the case, I cannot find, at this stage of the proceedings, that it is more likely than not that the plaintiffs will succeed on the merits of their claim to vested health care benefits under the 1999 CBA.

### b. Employees Retiring During the Term of the 2005 CBA

The plaintiffs also contend that employees who retired during the term of the 2005 CBA have a right to medical benefits that cannot be changed unilaterally by Volvo as long as the negotiated VEBA continues. The plaintiffs base their argument on language in the 2005 Benefits Agreement which created a trust fund known as a voluntary employee beneficiary association, ("VEBA"), into which Volvo was required to pay $3.9 million during the term of the agreement, including $1.6 million to be paid on the last day of the 2005 CBA. The agreement required that the VEBA assets be used to pay costs of health benefits exceeding certain stated annual limits, and it also contained provisions for negotiating future changes to retirees' benefits. In particular, the 2005 Benefits Agreement, which was attached to and incorporated in the 2005 CBA, provided that if retiree benefit costs exceeded the stated limits,

-26-

Volvo could either draw excess benefit costs from the VEBA trust or, if there was a projection in a calendar year that those excess costs would exhaust the VEBA trust and Volvo could not reach agreement with the UAW on benefit reductions to reduce those costs, Volvo could charge retirees a monthly contribution in an amount no greater than 1/12 of the average cost per participant in excess of the applicable limitation incurred in the preceding calendar year, provided that no employee would be required to pay monthly contributions for more than two participants to continue coverage. The plaintiffs argue that Volvo has not exercised either of these options, instead choosing to reduce retirees' benefits unilaterally, despite the fact that the December 31, 2008, notice stated that "substantial assets remain in the VEBA."

The plaintiffs' argument ignores the fact that the section of the 2005 Benefits Agreement preceding the section creating the VEBA trust states that Volvo Trucks North America will continue coverage under the Volvo-UAW health, dental and prescription drug programs for current and future retirees and eligible spouses and dependents only "for the duration" of the agreement. Therefore, based on the language of the 2005 Benefits Agreement, the court, at most, can find that the language of the 2005 Benefits Agreement is ambiguous as to whether it created any right to retiree health care benefits after its expiration. Thus, the court must look to the extrinsic evidence to determine the parties' intent. Again, the plaintiffs, who have the burden of showing their likelihood of success on the merits, have produced no extrinsic evidence of the parties' intent. To the contrary, the defendants have introduced evidence that the parties' conduct and negotiations over the years shows the parties' intent that retirees' health benefits would not survive the expiration of the 2005 CBA. That being the case, I cannot find that the plaintiffs are more likely than

Case 1:09-cv-00022-JPJ-PMS   Document 38   Filed 03/10/09   Page 27 of 36   Pageid#: 957

not to prevail on the merits on this argument.

Based on my finding that the plaintiffs have not met their burden of showing a likelihood of success on the merits, it is inappropriate to award preliminary injunctive relief and unnecessary to address the three remaining factors. Nevertheless, for judicial convenience, I will address these factors should the court overturn my finding that the plaintiffs have failed to demonstrate a likelihood of success on the merits.

*2. Irreparable Harm to Plaintiffs in Absence of Injunctive Relief*

The Second Circuit in *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55-56 (2d Cir. 2004) (quoting *U.S. Steelworkers of Am. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987)), held that irreparable harm may be established by:

> general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

The plaintiffs contend that the putative class members have made such a showing here. A declaration from Alan G. Cowan, a retiree of the NRV Plant, states that he is 57 years old, that he and his wife live on a fixed income of approximately $2,800 per month and that neither he nor his wife is physically able to return to work. (Exhibit

-28-

8 to Docket Item No. 21, ("Cowen Declaration"), at 1-2). He states that after paying for necessities, including health care, food, shelter and transportation, this money is essentially gone. (Cowan Declaration at 2-3.) Cowan further states that his wife is receiving treatment for breast cancer and that if he is forced to pay an additional $30 monthly health care premium, he would not be able to afford all of the medical care and prescriptions that he and his wife currently need, aside from any new medical conditions and related expenses that could arise. (Cowan Declaration at 3.) Cowan states that if Volvo is allowed to make the proposed changes March 1, 2009, he and his wife are very anxious about how they will afford the necessities. (Cowan Declaration at 3.)

Likewise, George W. Epperly Jr., another retiree of the NRV Plant, states in his declaration that he is 58 years old and is not eligible for Medicare. (Exhibit 5 to Docket Item No. 21, ("Epperly Declaration"), at 1.) He states that he lives on a fixed income of $1,570, but has been searching for a job to supplement this income. (Epperly Declaration at 2.) He states that despite applying to a minimum of 12 employers, he has not been hired, and he states that there are not many jobs available in the area where he lives. (Epperly Declaration at 2.) Epperly states that his necessary expenses, including medical care, food, shelter and transportation, account for nearly all of his monthly income. (Epperly Declaration at 2-3.) He states that being forced to pay the $30 monthly premiums, increased deductibles, copayments and coinsurance, as Volvo proposes, would mean that he would not be able to afford all of the medical care and prescriptions that he currently needs, and he would not be able to afford any medical care that could arise from new conditions that might arise. (Epperly Declaration at 3.)

-29-

Similarly, Donny Minnick, another retiree of the NRV Plant, states in his declaration that he is 61 years old and that neither he nor his wife is eligible for Medicare. (Exhibit 6 to Docket Item No. 21, ("Minnick Declaration"), at 1.) He states that he and his wife recently adopted two minor children, one nine years old and the other two years old. (Minnick Declaration at 2.) He states that the nine-year-old is currently covered by the benefits plan, and he expects to enroll the two-year-old for coverage very soon. (Minnick Declaration at 2.) Minnick states that his family lives on a fixed monthly income of $1,900. (Minnick Declaration at 2.) He states that there are few, if any, jobs available in the area where he lives, and it is unrealistic to think that he or his wife could secure employment. (Minnick Declaration at 2.) Minnick states that both he and his wife regularly take prescription medications, and the restructuring proposed by Volvo would mean that he would have to pay $80 monthly copayments, in addition to a $30 monthly premium and a $400 annual deductible. Minnick states that his necessary expenses, including medical care, food, shelter and transportation, account for essentially all of his monthly income and that the increased costs under the restructured plan would result in an inability to afford all of the medical care and prescriptions that his family requires, and he would have no money to pay for any new medical conditions that might arise. (Minnick Declaration at 3.) Minnick states that if Volvo is allowed to proceed with the restructured plan, he fears that his family would have to forgo necessary medical care or other necessities. (Minnick Declaration at 3.)

Likewise, Gene E. Altizer, another retiree of the NRV Plant, states in his declaration that he is 68 years old and, although he is covered by Medicare, his wife is not. (Exhibit 9 to Docket Item No. 21, ("Altizer Declaration"), at 1.) He states that

he and his wife live on a fixed monthly income of approximately $3,561. (Altizer Declaration at 2.) This includes $1,440, before taxes, that his wife earns monthly from her job. (Altizer Declaration at 2.) Altizer states that there are few available jobs in the area where he lives, and it is unrealistic to think that he could secure employment. (Altizer Declaration at 2.) He states that he and his wife both require prescription and over-the-counter medications, the copayments for which currently run $50 to $75 per month.(Altizer Declaration at 3.) Altizer states that his necessary monthly expenses, including medical care, food, shelter and transportation, take essentially all of his income. (Altizer Declaration at 3.) He states that his wife suffers from a medical condition that could require surgery in the near future. (Altizer Declaration at 3.) Altizer fears that the proposed $30 monthly premiums for coverage for his wife, the $200 annual deductible, increased copayments and coinsurance and increased prescription copayments, would prevent them from being able to pay for such surgery or for any new medical conditions that might require treatment. (Altizer Declaration at 3.) He states that he and his wife fear that they will have to forgo necessary medical care or other necessities if Volvo is allowed to proceed with the proposed restructuring. (Altizer Declaration at 3.)

Similarly, Donald A. Huffman, another retiree of the NRV Plant, states in his declaration that he is 67 years old and, although he is eligible for Medicare, his wife is not. (Exhibit 7 to Docket Item No. 21, ("Huffman Declaration"), at 1.) He states that he and his wife live on a fixed income of approximately $3,998.60. (Huffman Declaration at 2.) This includes $1920, before taxes, that his wife earns monthly from her job. (Huffman Declaration at 2.) Huffman states that it is not realistic to think that he could secure employment, and he cannot physically perform the type of work he

-31-

performed in the past. (Huffman Declaration at 2.) He states that both he and wife regularly take prescription medication, the cost of which would increase under the restructured plan, in addition to the $30 monthly premiums and the deductibles. (Huffman Declaration at 3.) Huffman states that virtually all of his monthly fixed income is used to pay for medical expenses and other necessities, including food, shelter and transportation. (Huffman Declaration at 3.) He fears that being forced to pay the increased rates under the restructured plan would mean that he and his wife could not afford to pay for necessary medical expenses or other necessities of life. (Huffman Declaration at 3.)

Finally, Asa Harrison, another retiree of the NRV Plant, states in his declaration that he will be 65 years old in March 2009 and that he will be eligible for Medicare at that time. (Exhibit 12 to Docket Item No. 21, ("Harrison Declaration"), at 1.) He states that his wife is not yet eligible for Medicare. (Harrison Declaration at 1.) Harrison states that he and his wife have a fixed monthly income of approximately $3,400 after taxes. (Harrison Declaration at 2.) He states that there are few jobs available in the area where he lives and that it is unrealistic to think that he or his wife could secure employment. (Harrison Declaration at 2.) Harrison states that both he and his wife have medical conditions that require regular doctor visits and that they both take prescription medications. (Harrison Declaration at 3.) He states that under Volvo's restructured plan, they would have to pay the $30 monthly premiums for his wife's coverage, the deductibles, additional copayments for doctor visits and approximately $50 per month in additional copayments for his wife's prescriptions, as well as the copayments for his own prescriptions. (Harrison Declaration at 3.) Harrison states that his wife requires a C-PAP machine which incurs additional

-32-

expenses. (Harrison Declaration at 3.) He states that his current medical expenses and other regular monthly expenses account for virtually all of his monthly income. (Harrison Declaration at 3.) Harrison states that he fears that the increased costs under the restructured plan would force him and his wife to forgo necessary medical treatment or other necessities of life. (Harrison Declaration at 3.)

All of this being said, it is clear to the court that the putative class members will have to make very difficult choices if the restructured health care plan is allowed to proceed. Specifically, there is a very real possibility that many of the class members would have to choose between necessary medical care and other necessities, such as food, shelter and transportation. That being said, the undersigned finds that the plaintiffs have made the requisite showing of irreparable harm should the injunctive relief they seek be denied.

### 3. Balance of Equities

As stated above, the plaintiffs have presented evidence that class members may have to choose between necessary medical care and other necessities. The defendants, on the other hand, have produced evidence that ever-increasing health care costs for employees, retirees and their families place an ever-increasing financial strain on this employer. The defendants, however, have provided the court with no evidence that it is unable to continue to bear such costs on a temporary basis until the parties' claims can be resolved on the merits. Furthermore, the court notes that the defendants concede that there are substantial funds remaining in the VEBA to use to offset the cost of continuing to provide health care benefits to retirees. When compared to the

-33-

plaintiffs' harm of possibly having to forgo basic necessities of life, it is clear to the court that the harm suffered by the plaintiffs should the injunctive relief be denied far outweighs the harm to the defendants by the grant of such relief.

### 4. Public Interest

The court recognizes that the public has an interest in protecting the health care benefits of retirees. *See McGlothlin v. Connors*, 142 F.R.D. 626, 645 (W.D. Va. 1992), ("[t]he public's interest in protecting participants in employee benefit plans and the public's interest in the right to contract tilts the public interest element of the *Blackwelder* test in favor of Plaintiffs"). Nevertheless, as stated above, the plaintiffs seek an extraordinary remedy, one that should be entered only upon the proper showing. Therefore, I cannot find that the public interest weighs in favor of entry of a preliminary injunction when the plaintiffs have not demonstrated a likelihood of success on the merits.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The court should deny the defendants' motion to dismiss or stay this case because application of the first-to-file rule is not appropriate given the facts of this case;

2. The court also should not transfer this case for consolidation with the North Carolina Action;

-34-

3.    Based on the evidence currently before the court, the plaintiffs have failed to meet their burden of showing a likelihood of success on the merits;

4.    The plaintiffs have met their burden to show irreparable harm;

5.    The balancing of the equities would tip in favor of granting injunctive relief to the plaintiffs;

6.    The public interest weighs against the entry of injunctive relief when the plaintiffs have failed to demonstrate a likelihood of success on the merits; and

7.    The court should deny the Plaintiffs' Motion For Preliminary Injunction.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny the Defendants' Motion To Dismiss, Stay, Or Transfer Venue, (Docket Item No. 5). I further recommend that the court deny the Plaintiffs' Motion For Preliminary Injunction, (Docket Item No. 20).

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by

-35-

the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 10th day of March 2009.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE