# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **MARY QUESENBERRY, et al.,** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:09cv00022** |
| | ) | |
| **VOLVO GROUP NORTH AMERICA,** | ) | **REPORT AND** |
| **INC., f/k/a VOLVO TRUCKS NORTH** | ) | **RECOMMENDATION** |
| **AMERICA, INC., et al.,** | ) | |
| **Defendants** | ) | |

The plaintiffs have brought this class action against the defendants, under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that, under § 301 of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 185, the defendants cannot unilaterally terminate or modify retiree healthcare benefits provided for under certain collective bargaining agreements. The plaintiffs further seek a declaration that, under §§ 502(a)(1)(B) and (a)(3) of the Employment Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), the defendants cannot unilaterally terminate or modify retiree healthcare benefits provided for the class representatives and those similarly situated. This case is currently before the court on the parties' cross motions for summary judgment, (Docket Item Nos. 79, 81). The motions are before the undersigned by referral pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. Facts

The class representatives were all employed by the defendant Volvo Group

North America, Inc., f/k/a Volvo Trucks North America, Inc., ("Volvo"), at the New River Valley Assembly Plant, ("NRV Plant"), in Dublin, Virginia, until their respective retirement dates, ranging from 2000 to 2007. They all were members of a bargaining unit represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, ("UAW"), and UAW Local Union 2069, ("Local 2069").

Plaintiff UAW is a labor organization within the meaning of § 2(5) of the National Labor Relations Act, ("NLRA"), 29 U.S.C. § 152(5), which represents certain Volvo employees in collective bargaining. The UAW has negotiated a series of collective bargaining agreements with Volvo and its corporate predecessors, under the terms of which Volvo retirees and their spouses, surviving spouses and dependents are entitled to retiree healthcare benefits. Plaintiff Local 2069 is a labor organization within the meaning of § 2(5) of the NLRA, which represents in collective bargaining the employees of Volvo's NRV Plant. Local 2069 also is a party to the series of collective bargaining agreements with Volvo and its corporate predecessors. Volvo is an "employer" within the meaning of § 2(2) of the NLRA, 29 U.S.C. § 152(2), and § 3(5) of ERISA, 29 U.S.C. § 1002(5), as well as a "plan sponsor" and "administrator" within the meaning of § 3(16)(A)-(B) of ERISA, 29 U.S.C. § 1002(16)(A)-(B), of the Volvo Trucks North America Retiree Healthcare Benefit Plan, ("Volvo Plan"), through which the retiree healthcare benefits at issue in this litigation are provided. Volvo is sued in its capacities as a party to the collective bargaining agreements with the UAW that established its obligation to provide retiree healthcare benefits and as plan sponsor and plan administrator of the Volvo Plan.

Volvo informed the UAW and Local 2069 in January 2008 that, following the expiration of the collective bargaining agreement then in effect, it intended to "restructure" the plan of benefits provided to current retirees, surviving spouses and eligible dependents who were entitled to receive benefits under the Volvo Plan. Volvo and the UAW negotiated changes for medical benefits to be provided to active employees and to employees retiring on or after March 17, 2008. Volvo and the UAW did not reach an agreement on any changes in medical benefits to be provided to retirees whose retirement dates were before March 17, 2008, to surviving spouses of such retirees and to surviving spouses of UAW-represented employees who died before March 17, 2008, while actively employed but after becoming eligible for a pension or for the dependents of any such retirees or surviving spouses. Volvo announced in a notice that it sent to members of the class on or about December 31, 2008, that it would unilaterally change their healthcare benefits effective March 1, 2009. These changes would require retirees who were not yet eligible for Medicare to begin paying monthly premiums in order to continue receiving benefits and to pay significantly greater deductibles, copayments and coinsurance than they had to date been required to pay. Retirees who were eligible for Medicare would be forced into a Medicare Advantage program, under which they would not receive the same benefits that they are entitled to receive under the collective bargaining agreements and under which, in many cases, would require payment of significantly higher deductibles, copayments and coinsurance than they had to date been required to pay.

The NRV Plant was originally built by White Motor Corporation, ("White Motor"), in 1974. In 1978, White Motor's production and maintenance employees voted for representation by the UAW. The UAW and Local 2069 negotiated the first

collective bargaining agreement, ("CBA"), which took effect in 1978. Although the NRV Plant was relatively new, the 1978 CBA incorporated language regarding retiree health insurance benefits in a Supplemental Benefits Agreement. The separate document that contained information on the retiree health insurance benefits was prefaced by the following language appearing under the heading "Duration of Agreement:" "This Agreement and Program as modified and supplemented by this Agreement shall continue in effect until the termination of Collective Bargaining Agreement of which this is a part." (1978 Supplemental Agreement, Plaintiffs' Exhibit to Docket Item No. 82, ("Plaintiffs' Exh."), 27 at 6-B - 7-B.)[1] The insurance program that followed this duration clause provides in Article III, Section 5:

> Health Care (other than Dental Prior to Sept. 1, 1981, and Vision) Coverages an employee has under this Article at the time of retirement... shall be continued thereafter provided that suitable arrangements for such continuation can be made with the local plans, or insured plans. Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(5).

(1978 Supplemental Agreement, Plaintiffs' Exh. 28 at 62-B to 63-B.)[2] Article I, Section 3(b)(5) reads, in relevant part:

> The Company shall contribute the full premium or subscription charge for Health Care (other than vision) coverages continued in accordance with Article III, Section 5, for:
> > (i)     a retired employee (including any eligible dependents), provided such retired employee is eligible for benefits

---

[1]All exhibits referenced in this Report and Recommendation will be referred to by its attachment number on the court's electronic docket rather than the exhibit number given to them by the parties.

[2]For some reason, page 62-B is not included in this exhibit. Defendants, however, do not dispute that this is the language contained in the 1978 Supplemental Agreement.

under Article II of the New River Valley Plant Hourly-Rate Employees Pension Plan...

(*Id.* at 13-B.)[3] The 1978 Supplemental Benefits Agreements also provided healthcare benefits for the surviving spouses of retirees and their eligible dependents "if such spouse is receiving or is eligible to receive a survivor pension benefit under Article II, of the New River Valley Hourly-Rate Employees Pension Plan," and if the decedent retiree also was receiving pension benefits at the time of his or her death. (*Id.* at 63-B to 64-B.)

In 1980, White Motor filed for bankruptcy under chapter 11 and, in connection with its reorganization, sold its truck manufacturing assets, including the NRV Plant, to Volvo. During the bankruptcy proceedings, Volvo retirees filed claims arguing that they had been promised lifetime health benefits. (Declaration of John T. Grigsby, ("Grigsby Dec."), Plaintiffs' Exh. 55 at ¶ 4.) White Motor's creditors objected to these claims, arguing that the retirees' health benefits were limited to the duration of each CBA. The issue was litigated, and the parties reached a settlement, approved as part of the plan of reorganization, under which $60 million was paid from the bankruptcy estate into a trust to be used to provide future health benefits to White Motor retirees. (Plaintiffs' Exh. 55 at ¶ ¶ 4-5.) Both the UAW and Volvo were involved in White Motor's bankruptcy proceedings. According to John Grigsby, White Motor's Chief Financial Officer with substantial responsibility in the bankruptcy proceeding, Volvo's involvement was such that Volvo "should have been aware of the litigation over the retiree health benefits, and should have been aware of

_____

[3]Page 13-B is not included in this exhibit, but the defendants do not dispute that this is the language contained in the 1978 Supplemental Agreement.

the basic positions that each side was taking in that litigation – namely, the UAW's position that the retirees were entitled to lifetime benefits, and the unsecured creditors' position that the retirees' rights to benefits were tied to the duration of the collective bargaining agreements and terminated when the collective bargaining agreements expired." (Plaintiffs' Exh. 55 at ¶ 6.)

After its purchase of the NRV Plant from White Motor, Volvo recognized the UAW as the bargaining representative of the NRV hourly employees. In 1981, Volvo entered into a new CBA with the UAW and Local 2069. Either in that year or in 1984 a new document entitled "Benefit Booklet" was adopted to replace the 1978 Supplemental Benefits Agreement. Although the Benefit Booklet bears no signatures, it was negotiated between the UAW and Volvo. (Declaration of David Hirschland, ("Hirschland Dec."), Plaintiffs' Exh. 61 at ¶¶ 4-6; Deposition of George Marik, ("Marik Depo."), Plaintiffs' Exh. 15 at 8-9, 23-24, 35-36.) The Benefit Booklet contained no "Duration of Agreement" provision.

With regard to retiree healthcare, the 1984 Benefit Booklet states:

> Health and dental care and the prescription drug benefit will be continued into retirement with Volvo White making the full contribution. This coverage will supplement Medicare at age 65.

(1984 Benefits Agreement, Plaintiffs' Exh. 31 at 26.) With regard to surviving spouses, the 1984 Benefit Booklet states:

> Your surviving spouse and eligible dependents may continue in the Volvo White health care insurance and prescription drug program by

contributing at the group premium rate. The first three months following the death of the employee is at no cost to the surviving spouse.

This coverage will be extended provided your spouse is receiving the Transition of [sic] Bridge Benefit or a Survivor Pension Benefit.

At age 65, the Volvo White group policy will become a Medicare Supplement policy.

(Plaintiffs' Exh. 31 at 25.) A series of CBAs and benefit booklets followed in 1987, 1991, 1994 and 1999 with no material change in the format or terms of the provisions regarding health benefits for retirees. The provisions regarding surviving spouses were changed in 1991. The 1991 CBA removed the three-month durational limit for "no cost" coverage and also extended this coverage to surviving spouses of "pension-eligible employees" who died while actively employed. (1991 Benefits Booklet, Plaintiffs' Exh. 34 at 33.)

Volvo has produced evidence from three of the negotiators involved in bargaining the 1991 CBA – George Marik, Volvo's then Vice President of Human Resources, Billy Joe Casstevens, then Secretary-Treasurer of the UAW, and UAW actuary Michael Dunn. Marik has testified that he understood that the 1991 CBA was providing benefits to NRV Plant retirees on a "me-too" basis – "whatever health benefits we negotiated for the current or active employees in the bargaining unit became applicable [to any current retirees] ... whether it went up or down, either way." (Marik Depo., Docket Item No. 80 Exhibit, ("Def. Exh."), 13 at 34:15-22.) Casstevens agreed that in 1991 and in general, both sides bargained over retiree health benefits. (Casstevens Depo., Def. Exh. 14 at 39-40.) Furthermore, Dunn has stated that, in his view, the 1991 negotiations did not lead to an agreement that provided retirees with

a right to unalterable healthcare benefits for life, but, rather, that healthcare benefits were subject to future negotiation. (Dunn Depo., Def. Exh. 1 at 64-65.)

Also, Volvo has produced evidence that the Union actually agreed to decrease some healthcare benefits provided retirees in the 1991 CBA. In particular, under the healthcare benefits provided by the 1987 Benefit Agreement, employees and retirees paid a $2.00 co-pay for any prescription drug. (Def. Exh. 15 at 27, 33.) The Union agreed to an increase in that co-pay in 1991. The 1991 CBA provided for a prescription drug benefit that required a $5.00 co-pay for name-brand drugs for which a generic alternative was available. (Def. Exh. 16 at 28.)

Volvo's lead negotiator at the 1994 negotiations, Executive Vice President of Industrial Operations W. Frank Adams, has stated that during the 1994 negotiations everything was subject to negotiation, including health benefits for current retirees. (Adams Decl., Def. Exh. 19 at ¶ 4.) Adams, however, recalls no specific discussion about retiree health benefits. During the 1994 negotiations, UAW International Representative Ronald Dannenhower "basically ran the negotiations, [for the Union] until we got to the final point where [the UAW] brought [in] some ... people ... from Detroit." (Dannenhower Depo., Def. Exh. 20 at 14:16-22.) Dannenhower has testified that the UAW's practice at that time was that retirees received whatever healthcare benefits the Union negotiated for active employees. (Def. Exh. 20 at 35:18-21.)

The Union's lead negotiator during the 1994 negotiations, Phil Cabreros, also has testified that any healthcare benefits negotiated for active employees under the 1994 CBA applied to retirees equally, on a "me-too" basis, could be negotiated

upward or downward, and could be renegotiated in future bargaining sessions. (Cabreros Decl., Def. Exh 21 at ¶¶ 8-11.) Dunn, who participated in benefits negotiations in 1991 and 1994, has stated that he believed that "any benefits for actives or retirees would be subject to the mutual agreement of the parties." (Def. Exh. 1 at 64-65.)

Healthcare benefits under the 1994 CBA were described in a document titled "Your Employee Benefit Booklet ... 1994-2000," ("1994 Benefit Booklet," Def. Exh. 22). The 1994 Benefit Booklet states: "Coverage under health, dental, and the prescription drug programs will be continued into retirement with Volvo Trucks [North America] making the full contribution. This coverage will supplement Medicare at age 65." (1994 Benefit Booklet, Def. Exh. 22 at 32.) The 1994 Benefit Booklet also states: "The surviving spouse and eligible dependents of a retiree or a pension-eligible employee are fully covered under the health, dental and prescription drug programs." (Def. Exh. 22 at 31.) The 1994 Benefit Booklet included at least one increase in healthcare benefits for retirees, in that for the first time they were covered for nonexperimental organ transplants. (Def. Exh. 22 at 16.) The 1994 Benefit Booklet also included at least three decreases in benefits. At least one of the decreases applied only to retirees. In particular, the 1994 Benefit Booklet covered the cost of a prescribed truss, brace, crutch or artificial limb or eye for active employees and their dependents only. (Def. Exh. 22 at 17.) These expenses were covered for both active employee and retirees under the 1991 Benefits Agreement. (Def. Exh. 16 at 15, 34.)

In 1998, Volvo approached the UAW and asked it to reopen the 1994 contract for early negotiations. As a result of these negotiations, Volvo and the Union reached

a six-year agreement effective in 1999. The 1999 CBA contains the same language regarding retiree healthcare benefits. It states: "Coverage under health, dental, and the prescription drug programs will be continued into retirement with Volvo Trucks North America making the full contribution. This coverage will supplement Medicare at age 65." (1999 CBA, Plaintiffs' Exh. 49 at 171.) The language regarding benefits for surviving spouses and dependents changed, in that the 1999 CBA states: "The surviving spouse and eligible dependents of a retiree or a pension-eligible employee are fully covered under the health, dental and prescription drug programs *at no cost*." (Plaintiffs' Exh. 49 at 171.) (Emphasis added.) Under the 1999 CBA, Volvo and the Union agreed to a cap on retiree healthcare benefits, which was included a single-paragraph "unpublished" side letter regarding retiree healthcare benefits. ("Cap Letter," Def. Exh. 24.) This Cap Letter states, in its entirety:

UNPUBLISHED LETTER
RETIREE HEALTH CARE CAPS

> Retiree Health Care Liability Caps will be set at 200% of the 1999 individual family member status premium levels, depending upon Medicare eligibility. The Company will set the effective date of such caps one (1) year beyond the expiry of the current Agreement; and agrees to increase such caps as necessary at levels mutually agreeable to the parties.

(Emphasis in original). Volvo's lead negotiator regarding this issue, Stanley Ellspermann has testified that he and UAW negotiator Cabreros discussed that the clause in the Cap Letter stating that "[t]he Company will set the effective date of such caps one (1) year beyond the expiry of the current Agreement," meant that "the caps would exist for a year beyond the expiration of the agreement...." (Ellspermann Depo.,

Plaintiffs' Exh. 8 at 46-48.) Ellspermann admitted it was his understanding that the Cap Letter would remain in effect only for one year after the expiration of the 1999 CBA. (Plaintiffs' Exh. 7 at 46-48.) The 1999 Benefits Agreement also included another increase in the co-pays on prescription drugs to $5.00 and $10.00, the higher amount being for brand-name drugs for which there was a generic alternative. (Def. Exh. 26 at 163.) The 1999 Benefits Agreement also limited the benefits for certain sexual dysfunction drugs. (Def. Exh. 26 at 166.)

Prior to 2000, employees retiring from Volvo were mailed a packet of retirement materials. In 1999-2000, the cover letter sent in that packet stated: "[a]s a Volvo retiree, your Health, Dental and PCS benefits will continue into retirement with Volvo paying the full cost. This coverage will supplement Medicare at age 65." (Example of Benefits Packet, Def. Exh. 34 at 3.) The plaintiffs also have produced evidence that Volvo management told retirees that their healthcare benefits would continue into retirement. In particular, Bruce Jennings, the head of the Human Resources Department at NRV beginning in May or June 2000, has testified that, after becoming the head of the Human Resources Department, he began advising employees who were retiring about their benefits. (Jennings Depo., Plaintiffs' Exh. 13 at 17, 22-24.) Jennings testified that he told employees that their healthcare benefits "would continue ... into retirement." (Plaintiffs' Exh. 13 at 22-24.) Jennings also stated that he did not tell employees that after retirement their healthcare benefits would expire with the duration of the CBA. (Plaintiffs' Exh. 13 at 22-24.)

Despite the existence of the 1999 Cap Letter, Greg Tinnell, Volvo's lead negotiator in the 2005 negotiations, has testified that one of Volvo's main goals in

2005 was to obtain "hard caps" or caps on retiree medical costs that would be enforced. (Tinnell Depo., Plaintiffs' Exh. 19 at 8, 19-20, 48-50.)

The 2005 CBA contained language that replaced the earlier retiree health benefit provisions. Appendix B to thse 2005 Benefits Agreement reads:

Eligibility. Current retirees (not deferred vested retirees): employees who retired after January 1, 1988 and before February 1, 2005: and Future retirees: employees whose seniority dates precede February 1, 2005 and who retire on or after February 1, 2005.

Coverage. Volvo Trucks North American, Inc. will continue coverage under the Volvo-UAW health, dental and prescription drug programs ("the Volvo Plan") for current retirees and future retirees as well as their spouses, surviving spouses, and eligible dependents, and for surviving spouses of pension eligible employees whose seniority dates precede February 1, 2005 (hereinafter, "Retiree Participants"), for the duration of this Agreement.

Cost. The Company will pay the cost of continued coverage under the Volvo Plan for Retiree Participants in an amount not to exceed an average cost per Retiree Participant of $13,606 per calendar year for non-Medicare eligible Retiree Participants. For Retiree Participants who become eligible for Medicare under the Social Security Act, the Volvo Plan shall supplement Medicare. The Company will pay the cost of Medicare supplemental coverage for each Medicare-eligible Retiree Participant in an amount not to exceed an average cost per Retiree Participant of $3,292 per calendar year. In calculating the average cost per participant for Medicare-eligible Retiree Participants, the Company shall subtract from gross claims the estimated amount of the Medicare Part D subsidy. In addition, the Company will establish a Trust Fund in compliance with IRC section 501(c)(9) ("the VEBA Trust") and contribute the sum of $3,943,000.00 to the Trust according to the following schedule: $194,000.00 on or before January 31, 2006; $2,164,000.00 on or before January 31, 2007; and $1,585,000.00 on or before January 31, 2008. The assets of the VEBA Trust, including the above-described contributions and all earnings net of expenses thereon,

shall be held and used for the exclusive purpose of paying all costs incurred by Retiree Participants under the Volvo Plan that exceed the limits set forth above. If the cost of non-Medicare coverage and/or Medicare supplemental coverage for a calendar year is projected to exceed the limits set forth above and exhaust the VEBA Trust, the Company and the Union will meet to develop changes to the Volvo Plan as it applies to each group which will reduce the average cost per participant projected for the following year below the applicable limitation. If the Union is unwilling to meet or if the parties are unable to reach agreement on plan changes that will reduce the projected cost below the applicable limitation, the Company will charge each retiree/surviving spouse a monthly contribution for each covered participant (including the retiree, spouse, surviving spouse, and eligible dependents) equal to one-twelfth (1/12th) of the average cost per participant in excess of the applicable limitation (net of costs in excess of the limitation paid out of the VEBA Trust) incurred in the preceding calendar year; provided that no retiree shall be required to pay monthly contributions for more that two participants (including himself/herself) to continue coverage for his/her spouse and all eligible dependents.

(2005 Benefits Agreement, Def. Exh. 30 at 122-123.)

Under the 2005 Benefits Agreement, the per participant cost numbers were equal to the cost numbers contained in the Cap Letter. Those numbers – $13,606 per year pre-Medicare and $3,292 per year for Medicare eligibles – represented "200% of the 1999 individual family member status premium levels." The parties also agreed that the money in the VEBA Trust would belong to retirees and would be for the "exclusive purpose of paying all costs incurred by Retiree Participants under the Volvo Plan that exceed the limits." (2005 Benefits Agreement, Def. Exh. 30 at B122-23.)

The plaintiffs have produced evidence that the funding source for the VEBA

was money that Volvo was prepared to offer in 2005 as wage increases. In particular, both Tinnell and UAW lead negotiator Timothy Bressler have testified that the VEBA was created by diverting a portion of a proposed wage increase to fund it. (Plaintiffs' Exh. 19 at 40; Plaintiffs' Exh. 4 at 73, 91-92.) Bressler testified that the parties agreed to divert $3.6 million in wage increases to fund the VEBA. (Plaintiffs' Exh. 4 at 116.) He also testified that the parties projected that retiree healthcare costs would exceed the caps put into place by the 2005 CBA, by only $400,000 during the duration of the CBA. (Plaintiffs' Exh. 4 at 116.) Bressler also has testified that with no further funding, the VEBA was expected not to be exhausted until 2014. (Plaintiffs' Exh. 4 at 76-77.) Volvo officials have confirmed that estimates at the time showed that the funds put in the VEBA were not expected to be exhausted until after the expiration of the 2005 CBA. (Plaintiffs' Exh. 16 at 138-39; Plaintiffs' Exh. 12 at 74-75.)

A UAW information sheet published on the 2005 CBA stated:

Health Care Improvements
- Fully-paid health care for retirees – no cost shifting

(Plaintiffs' Exh. 53 at 1.)

An enclosed letter from UAW Vice President Nate Gooden stated: "To win a contract that preserves full employer-paid health care for retirees and active workers, with no premium sharing whatsoever, is no small achievement." (Plaintiffs' Exh. 53 at 2.) The information sheet also stated:

HEALTH CARE

Retirees Keep full benefits ...

> Our proposed agreement preserves full company-paid health care for our retired members. This was a major issue in negotiations, with the company taking an initial position that would have required drastic cuts in retiree health care. Our Bargaining Committee took the position that this was unacceptable, and we negotiated a new financing mechanism to preserve all promised health benefits for retirees.

(Plaintiffs' Exh. 53 at 4.)

Also, under the 2005 CBA, all Volvo active employees and retirees were forced to switch from a traditional "Open Choice" healthcare plan to a "Point-of-Service" plan. (Def. Exh. 27 at PL 0010302.) The change meant that pre-Medicare retirees were now forced to choose a primary care physician to coordinate their healthcare. The Point-of-Service plan also required a $25 co-pay on emergency room expenses. (Declaration of Kaye McLeod, ("McLeod Decl."), Def. Exh. 3 at ¶ 9.)

UAW has produced evidence that an earlier draft of the 2005 retiree benefit language sent to it for review included language under the "Cost" section which stated: "For Retiree Participants who become eligible for Medicare under the Social Security Act, the Volvo Plan shall supplement Medicare *for the duration of this Agreement*." (Emphasis added.) (Plaintiffs' Exh. 24 at 7.) UAW objected to the inclusion of the italicized phrase, and Volvo agreed to remove it. Volvo's head of benefits, Kaye McLeod, wrote explaining: "The stricken language was not intended to affect the irrevocable nature of the VEBA Trust so we have eliminated it to avoid any ambiguity on that issue." (Plaintiffs' Exh. 23 at 1, 6.) In her deposition, McLeod

further explained: "[T]he VEBA Trust that we established was a permanent trust until it ran out of money. It didn't necessarily – it did not end with the duration of the agreement if there was still money in it." (Plaintiffs' Exh. 16 at 83-84.)

In 2008, Volvo told the UAW that it would not bargain over benefits for "current retirees," meaning employees who retired before the 2008 CBA was signed. (Plaintiffs' Exh. 16 at 104-06.) Instead, Volvo announced to the UAW its plans to unilaterally restructure the healthcare benefits of current retirees after the conclusion of the 2008 negotiations. (Plaintiffs' Exh. 16 at 107-08.) In a notice sent to retirees on or about December 31, 2008, Volvo announced that it would unilaterally change their healthcare benefits effective March 1, 2009. (Answer, (Docket Item No. 18), ¶ 29.) The changes described in that notice went into effect on March 1, 2009, for retirees who were not yet eligible for Medicare. These changes required the pre-Medicare retirees and their dependents to pay monthly premiums in order to continue receiving benefits, and to pay significantly larger deductibles, copayments and coinsurance than they had previously paid. On May 1, 2009, Volvo announced that it would stop providing healthcare coverage for all Medicare-eligible retirees and would instead require them to arrange for their own coverage to be paid from an individual Health Care Reimbursement Arrangement to which Volvo would annually contribute $3,500 per person. (Plaintiffs' Exh. 42.) That change went into effect on July 1, 2009. Volvo admits that substantial assets remain in the VEBA. (Plaintiffs' Exh. 41 at 1.)

In 2008, after the 2005 CBA had expired, the NRV employees went on strike for approximately six weeks. (Plaintiffs' Exh. 13 at 93.) During this strike, Volvo decided to cut off healthcare benefits for active employees but not for retirees.

(Plaintiffs' Exh. 16 at 153; Plaintiffs' Exh. 13 at 94-95.) When retirees' benefits were mistakenly terminated by Volvo's insurance carrier, the retirees' benefits were quickly reinstated. (Plaintiffs' Exh. 13 at 94-96.)

## II. Analysis

The issue in this case is whether the relevant collective bargaining agreements in effect at the time the putative class members retired created vested healthcare benefits. The plaintiffs claim that the retiree healthcare benefits promised to the class members in the relevant collective bargaining agreements cannot be changed unilaterally by Volvo, and that do to so would constitute violations of the LMRA and ERISA. Volvo argues that all collective bargaining agreements that promised health benefits to retirees and dependents have expired and no longer create binding obligations on Volvo to provide any healthcare benefits to any employees who retired prior to February 1, 2008. Plaintiffs claim there are no genuine issues of material fact and ask the court to enter summary judgment in their favor as to liability. Volvo also claims that there are no genuine issues of material fact and asks the court to enter summary judgment in its favor. Based on my review of the evidence, I find that there are genuine issues of material fact that preclude the entry of summary judgment in favor of either side.

Contractual obligations under a collective bargaining agreement, in the ordinary course, will cease upon termination of the bargaining agreement. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991). Vested benefits, however, are not affected by the subsequent expiration of a collective bargaining agreement. *See Litton*

*Fin. Printing Div.*, 501 U.S. at 207 (stating that "[r]ights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement"). As an "employee welfare benefit plan" as defined by ERISA, the benefits established by the Volvo Plan are not statutorily required to vest. *See* 29 U.S.C.A. §§ 1051(1), 1053 (West 2008); *Wheeler v. Dynamic Eng'g, Inc.* 62 F.3d 634, 637 (4th Cir. 1995). The terms of a welfare benefit plan may create vested rights, and, if it does so, the employer or sponsor is not free to change those rights unilaterally. *See Blackshear v. Reliance Standard Life Ins. Co.,* 509 F.3d 634, 640, 644 (4th Cir. 2007).

Whether benefits promised in a collective bargaining agreement survive the termination of that agreement depends upon the intent of the parties as expressed in their agreement. *See Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 62 (4th Cir. 1989) (citing *District 29, United Mine Workers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985)). The question is primarily one of contract interpretation. *See Keffer,* 872 F.2d at 62 (citing *Royal Coal*, 768 F.2d at 590). Furthermore, in order to interpret a collective bargaining agreement, "it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Keffer*, 872 F.2d at 62 (quoting *Transp.-Commc'n Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966)).

As with any contract interpretation, the court must first look at the language of the agreement for any "clear manifestation of the parties' intent." *Keffer*, 872 F.2d at 62 (citing *Royal Coal*, 768 F.2d at 590). Moreover, the document should be read as a whole, giving effect to all of its parts and reading related documents together. *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005); *see also Hitachi*

*Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). There are no specific words that must be contained in an agreement in order for the court to find that benefits were vested. Instead, the relevant question is whether the parties intended for the benefits to vest. *See Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1519 (8th Cir. 1988). It also is important to note that the plaintiffs bear the burden of proving that their health insurance benefits have vested. *See Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.*, 122 F.3d 228, 231 (5th Cir. 1997) (citing *Anderson,* 836 F.2d at 1517).

The defendants argue that the Fourth Circuit's decision in *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994), and this court's prior decisions in this case require that "the intention to vest must be found in 'clear and express language.'" *See* Report and Recommendation dated March 10, 2009, (Docket Item No. 38), at 21 (quoting *Gable*, 35 F.3d at 855). It is important to note that *Gable* involved an ERISA claim only. The welfare benefit plan at issue in *Gable* was put into place by the employer's action only, not as a result of collective bargaining. In such a case, it is reasonable for there to be a presumption against vesting because ERISA does not require employee welfare benefit plans to vest. *See Gable*, 35 F.3d at 855; 29 U.S.C. §§ 1051(1), 1053.

In this case, the welfare benefit plans at issue were reached after negotiations and agreement through the collective bargaining of the parties. Thus, the rights at issue here were established by contract – a meeting of the minds. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). In such a case, if the contract language is not clear as to whether the rights should vest, it appears more appropriate

to consider the extrinsic evidence of the parties' intentions rather than to simply invoke a presumption against vesting. Therefore, it appears that the proper rule to be applied is that the evidence, when taken as a whole, must show a clear intent to create vested benefits.

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). With regard to a contract dispute, "[i]f there is more than one permissible inference as to intent to be drawn from the language employed, the

question of the parties' actual intention is a triable issue of fact." *Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726 (4th Cir. 1979).

### a. Retirees Who Retired Prior to February 1, 2005

The plaintiffs claim that certain healthcare benefits vested for employees who retired prior to the expiration of the parties' 1999 CBA on February 1, 2005. Thus, the court's analysis must begin with the language of the agreement at issue. This court previously found that the relevant provisions of the CBAs at issue are ambiguous and require a review of extrinsic evidence in order to interpret them. The parties have not submitted any evidence or argument to change the court's opinion on the ambiguity of the language of the CBAs. *See* Report and Recommendation dated March 10, 2009, (Docket Item No. 38). Both the 1994 and the 1999 CBA contain the following language: "[C]overage under health, dental, and the prescription drug programs will be continued into retirement with Volvo Trucks North America making the full contribution." The CBAs further state: "[t]he surviving spouse and eligible dependents of a retiree or a pension-eligible employee are fully covered under the health, dental and prescription drug programs ...." The 1999 CBA added "at no cost" to the previous language.

The plaintiffs claim that the language of the CBAs supports a finding that the parties intended for retiree healthcare benefits to vest. The plaintiffs note that while many other provisions included in the 1994 and 1999 CBAs contained explicit language limiting some employer obligations to the "term" or "life" or "period" of the agreement, the provisions requiring Volvo to continue healthcare benefits for retirees

contain no such limitations. The plaintiffs also note that the agreements contain no statement that a retiree's benefits could be reduced or terminated upon the expiration of the collective bargaining agreement, no clause reserving to Volvo a right to make unilateral changes in retiree benefits and no clause reserving to Volvo and the UAW a joint right to negotiate reductions in benefits for employees who have previously retired. That being the case, the plaintiffs contend that Volvo's obligation to provide medical benefits after an eligible employee's retirement is unqualified.

The plaintiffs also argue that the fact that the CBAs provide benefits for surviving spouses of retirees indicates that the retirees' benefits were intended to continue past the expiration of the CBAs. *See Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993); *UAW v. Alcoa*, 932 F. Supp. 997, 1006 (N.D. Ohio 1996); *UAW v. Loral Corp.*, 873 F. Supp. 57, 64 (N.D. Ohio 1994), *aff'd* 107 F.3d 11 (6th Cir. 1997). The plaintiffs also argue the same is true of the provision that the Volvo Plan benefits will supplement Medicare once a retiree reaches age 65.

The Fourth Circuit in *Keffer*, 872 F.2d at 63, affirmed a district court's finding that agreements that limited other benefits to the life of the agreement, but provided for a retiree's medical coverage to continue until Medicare eligibility "can only be rationally interpreted as contractually obligating [the employer] to provide the [r]etirees' medical coverage beyond the expiration of the collective bargaining agreement." The Fourth Circuit in *Keffer,* however, based its finding not only on the language contained in the agreement. The Fourth Circuit found that the context in which retiree healthcare benefits had been negotiated supported the conclusion that

they were intended to continue beyond the agreement's expiration. *See Keffer*, 872
F.2d at 64.

The language contained in the 1994 and 1999 CBAs, stating that benefits for
retirees, surviving spouses and dependents "will be continued" "at no cost" or "with
Volvo Trucks North America making the full contribution" is similar to language that
other courts have found to unambiguously create vested benefits.  For instance, the
Sixth Circuit in *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 248 (6th Cir. 1996), found
that the language "[w]hen you are retired, your Health Care coverages, except for
vision, are continued without cost to you" demonstrated an intent to vest benefits.  The
Sixth Circuit held similarly in *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir.
1989), that the language "[b]enefits will continue for retirees" supported a decision
that the retiree benefits had vested.  On the other hand, other courts have ruled that
similar language was ambiguous, requiring the consideration of extrinsic evidence to
discern the parties' intent. *See Keffer*, 872 F.2d at 64 (court looked not only to
language of agreement, but also to conduct of parties); *Bland,* 401 F.3d at 785-87
(language that "coverage remains in effect as long as you are living" is ambiguous);
*Masonite,* 122 F.3d at 231-33 (language that retirees "will be entitled" to insurance
benefits "until ... death" found ambiguous).

As stated above, the 1999 CBA states: "Coverage under the health, dental, and
the prescription drug programs will be continued into retirement with Volvo Trucks
North America making the full contribution." Also, "The surviving spouse and
eligible dependents of a retiree or a pension-eligible employee are fully covered under
the health, dental and prescription drug programs at no cost." While it may be argued

that this language, standing alone, means that these benefits would be available to retirees and their dependents at no cost, when viewed in the context of the entire collective bargaining agreement, it is clear that these benefits were never intended to be available at no cost. The Benefits Section of the 1999 CBA lists a number of costs to employees, retirees, spouses and dependents associated with their health, dental and prescription drug programs, including deductibles, co-pays and limitations on coverage. Furthermore, as Volvo points out, the entire health benefits plan is set up as a section of a collective bargaining agreement which had a clear expiration date of January 31, 2005. That being the case, I find that the court must turn to extrinsic evidence to determine the parties' intent.

The plaintiffs argue that the extrinsic evidence shows that the parties intended retirees' health benefits to vest. The plaintiffs argue that the legal context in which retiree health benefits were negotiated supports a finding that they were intended to continue beyond the agreement's expiration. In particular, the plaintiffs argue that, given the history regarding the litigation in White Motor's bankruptcy over the duration of retiree healthcare benefits, Volvo should have been aware of the potential significance to the UAW of removing any duration clause from the Benefits Booklet. The plaintiffs argue that the omission of a duration clause is strong evidence that the parties intended that retiree benefits would not be limited to the duration of the CBA. The plaintiffs also contend that such benefits typically are viewed as a form of delayed compensation or reward for past services and, therefore, would not be left to the contingencies of future negotiations. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). The plaintiffs also argue that what Volvo management told retiring employees

prior to 2005 is evidence of the parties' intent that the benefits were vested. The plaintiffs further contend that the fact that the 2005 Benefits Agreement imposed no increased healthcare costs on retirees who had retired under the earlier agreements, while significantly increasing such costs for active employees and employees who retired during the term of the 2005 Agreement, evidences that the prior retirees' benefits had vested.

The defendants argue that the extrinsic evidence shows that the parties have a history of negotiating and implementing healthcare benefit changes that applied to existing retirees and that this evidences the parties' intent that retirees' healthcare benefits did not vest. In particular, the defendants have produced evidence that retirees paid increased co-pays for prescription drugs contained in the 1991 and 1999 CBAs. The defendants also rely on testimony from Union negotiators that they understood they were negotiating retiree healthcare benefits on a "me - too" basis. In particular, the defendants point to the testimony of Casstevens, Dunn, Dannenhower and Bressler, who all have testified that they understood current retiree healthcare benefits were the subject of negotiations. (Def. Exh. 14 at 39-40; Def. Exh. 1 at 64-65; Def. Exh. 20 at 35; Def. Exh. 17 at 68-69.) The defendants also point out that the Union negotiated and agreed to caps on Volvo's liability for retirees' healthcare costs beginning with the 1999 CBA, an act that, the defendants argue, is inconsistent with vested unchangeable healthcare benefits.

Thus, the parties have presented contradictory evidence with regard to whether they intended to create vested retiree healthcare benefits for retirees who retired prior to February 1, 2005. That being the case, there is a genuine issue of material fact

precluding the entry of summary judgment on this issue in either side's favor. Therefore, I will recommend that the court deny the motions on this issue.

### b. Employees Retiring During the Term of the 2005 CBA

The 2005 CBA contains a durational clause, which states that Volvo would continue healthcare benefits for current and future retirees "for the duration of this Agreement." (Def. Exh. 30 at 122.) Despite this language, the plaintiffs contend that employees who retired during the term of the 2005 CBA have a right to healthcare benefits that cannot be changed unilaterally by Volvo as long as the negotiated VEBA continues. The plaintiffs base their argument on language in the 2005 Benefits Agreement which created the VEBA Trust, into which Volvo was required to pay $3.9 million during the term of the agreement, including $1.6 million to be paid on the last day of the 2005 CBA. The agreement required that the VEBA assets be used to pay costs of health benefits exceeding certain stated annual limits, and it also contained provisions for negotiating future changes to retirees' benefits. In particular, the 2005 Benefits Agreement, which was attached to and incorporated in the 2005 CBA, provided that if retiree benefit costs exceeded the stated limits, Volvo could either draw excess benefit costs from the VEBA Trust or, if there was a projection in a calendar year that those excess costs would exhaust the VEBA Trust and Volvo could not reach agreement with the UAW on benefit reductions to reduce those costs, Volvo could charge retirees a monthly contribution in an amount no greater than 1/12 of the average cost per participant in excess of the applicable limitation incurred in the preceding calendar year, provided that no employee would be required to pay monthly contributions for more than two participants to continue coverage. The plaintiffs

argue that Volvo has not used the VEBA Trust to supplement the healthcare cost caps and that Volvo has not tried to negotiate on any benefits reduction with the UAW. Instead, Volvo reduced retirees' benefits unilaterally, despite the fact that the December 31, 2008, notice stated that "substantial assets remain in the VEBA."

The defendants argue that the 2005 Benefits Agreement duration clause is clear and unambiguous. Thus, the defendants argue there is no need to turn to extrinsic evidence of the parties' intent. While the durational clause standing alone does not appear ambiguous, I find that when read in context it is. In particular, the paragraph immediately after the durational clause states: "The Company will pay the cost of continued coverage under the Volvo Plan for Retiree Participants...." The paragraph continues to establish the VEBA Trust for use to pay expenses in excess of the caps set by the agreement. Oddly, the paragraph provides for a contribution of almost $1.6 million by Volvo on January 31, 2008 – the day before the expiration of the 2005 CBA. It makes no sense that the parties would negotiate the deposit of such a large payment on that date, if Volvo had no obligation to continue to pay any retiree healthcare costs after the next day. Thus, I believe the court must view the language of the contract in light of the extrinsic evidence to determine the parties' intent.

The plaintiffs argue that the language of the 2005 Benefits Agreement requires two events before Volvo may unilaterally change retiree health benefits: 1) retiree healthcare costs for a calendar year must be projected to exceed the caps and exhaust the VEBA Trust; and 2) the Union must be unwilling to meet or the parties unable to reach an agreement on plan changes to reduce projected costs. The plaintiffs also have produced evidence that the parties' negotiations in establishing the trust show an

intent that the trust would be exhausted before healthcare costs would increase for current retirees. In particular, the plaintiffs cite the evidence that both sides knew that much more money was being deposited in the VEBA than was necessary to meet the retirees' needs through the end of the CBA. The plaintiffs also argue that evidence of the removal of a durational clause that was originally placed in the section establishing the VEBA shows the parties' intent that the VEBA would be used to offset retiree healthcare costs until it was exhausted and not just for the duration of the CBA.

On the other hand, the defendants, as stated above, rely primarily on the durational clause contained in the 2005 CBA. The defendants argue that the UAW's negotiators have admitted that they knew the language of the 2005 CBA limited retiree healthcare benefits to the term of the contract. (Def. Exh. 7 at 62; Def. Exh. 17 at 33-34.)

Again, the parties have presented contradictory evidence with regard to whether they intended to create retiree healthcare benefits under the 2005 CBA that could not be altered until the VEBA was exhausted. I find that there is a genuine issue of material fact, and I recommend that the court deny the parties' motions on this issue as well.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      The language of the CBAs at issue is ambiguous, and, therefore, the court must consider extrinsic evidence of the parties' intent;

2.      The evidence presented by the parties creates a genuine issue of material fact as to whether the parties intended to create vested healthcare benefits for those employees who retired prior to February 1, 2005; and

3.      The evidence presented by the parties creates a genuine issue of material fact as to whether the parties intended under the 2005 CBA to create retiree healthcare benefits that could not be altered until the VEBA was exhausted.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny the parties' cross motions for summary judgment.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within 14 days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or

recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 2nd day of March 2010.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE