**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | |
|---|---|
| MARY QUESENBERRY, PAUL E. HOLLANDSWORTH, WALTER E. VIERS, CURTIS L. COX, ROBERT K. GOAD, SHIRLEY I. TOLBERT, on behalf of themselves and all other persons similarly situated; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA and UAW LOCAL UNION 2069 | Judge James P. Jones Magistrate Judge Pamela Meade Sargent |
|                Plaintiffs, | Civil Action No. 1:09-cv-00022 |
|    v. | |
| VOLVO GROUP NORTH AMERICA, INC. f/k/a VOLVO TRUCKS NORTH AMERICA, INC. and VOLVO TRUCKS NORTH AMERICA RETIREE HEALTHCARE BENEFIT PLAN | |
|                Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES

As the prevailing parties in this action, and for the reasons set forth below,

Plaintiffs Mary Quesenberry, Paul Hollandsworth, Walter Viers, Curtis Cox, Robert

Goad, and Shirley Tolbert (collectively, "Named Plaintiffs"); International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"); and

UAW Local 2069, respectfully request that the Court exercise its discretion under section

502(g) of  the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1132(g)(1), and award them attorneys' fees and expenses in the amount of $1,047,601.42.

## ARGUMENT

**I.    Following Fourth Circuit precedent, the Court should exercise its discretion and award the Plaintiffs reasonable attorneys' fees and expenses.**

It is within the Court's discretion to grant reasonable attorneys' fees and expenses in an ERISA action.  *See* 29 U.S.C. § 1132 (g)(1) ("In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.") [1]; *see also Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993).  This case qualifies for such an exercise of discretion because Plaintiffs' ERISA claims were advanced under ERISA sections 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), which are within the same subchapter. *See* Amended Complaint at 3 [Dkt. No. 72].  Also, the Named Plaintiffs – individually and as representatives of the Plaintiff Class – are "participants," and represent "beneficiaries," as those terms are defined by ERISA.  *See* 29 U.S.C. §§ 1002(7) & (8).[2]

In exercising its discretion to award the Plaintiffs attorneys' fees and expenses under ERISA, the Court is guided by decisions of the Fourth Circuit.  First, ERISA attorneys' fees and expenses may only be awarded to prevailing parties.  *Martin v. Blue*

---

[1] Paragraph (2) describes the recovery available to fiduciaries who sue for or on behalf of an ERISA plan to enforce 29 U.S.C. §1145.  It does not apply in this case.

[2] 29 U.S.C. §§ 1002(7) and (8) read:

> (7) The term "participant" means an employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.
> (8) The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

*Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1210 (4th Cir. 1997).[3]  Second, the

Court must consider, and state its findings on, five factors listed in *Quesinberry v. Life*

*Insurance Co. of North America*, 987 F.2d 1017, 1029 (4th Cir. 1993).  Third, the Court

"must . . . bear in mind the remedial purposes of ERISA to protect employee rights and to

secure effective access to federal courts. … [I]n order to effectuate the remedial purposes

of ERISA, a prevailing individual beneficiary 'should ordinarily recover attorneys' fees

unless special circumstances would render such an award unjust.'" *Id.* (quoting *Reinking*

*v. Phila. Am. Life Ins. Co.*, 910 F.2d 1210, 1218 (4th Cir. 1990) (internal citation

omitted)).

### a.  As the prevailing parties in this action, Plaintiffs should be awarded attorneys' fees and expenses.

A prevailing party is one that "receive[s] at least some relief on the merits of his

claim."  *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,

532 U.S. 598, 603-04 (2001) (internal quotation omitted); *see also Hardt v. Reliance*

*Standard Life Ins. Co.*, 336 Fed. App'x 332, 335 (4th Cir. 2009) (applying the

*Buckhannon* standard to an ERISA attorneys' fees case).  "[E]ven an award of nominal

damages suffices under this test."  *Buckhannon*, 532 U.S. at 604.

Plaintiffs are the prevailing parties in this suit and on the ERISA claims.  On

March 26, 2010, following a five day trial of the Labor Management Relations Act

("LMRA") claims , the jury entered a verdict in Plaintiffs' favor.  *See* Jury Verdict [Dkt.

No. 195].  On March 29, 2010, in accordance with the jury verdict, the Court entered

---

[3] A petition for certiorari was granted by the Supreme Court of the United States on January 15, 2010, to review *Hardt v. Reliance Std. Ins. Co.*, 336 Fed. App'x 332 (4th Cir. 2009), on, *inter alia*, the question whether the ERISA statute grants courts discretion to award attorneys' fees and expenses only to prevailing parties.  *See Hardt v. Reliance Std. Ins. Co.*, 130 S. Ct. 1133 (2010).  As the Supreme Court has yet to rule on this question and because such ruling would not affect this motion, this Memorandum is based on the current Fourth Circuit law.

final Judgment [Dkt. No. 196].  Of necessity, the Court's final Judgment resolved all of Plaintiffs' claims, including the ERISA claims that paralleled the LMRA claims.  *See* 12 James Wm. Moore et al., *Moore's Federal Practice* § 58.02[1] (3d ed. 2010) ("A final order is one that is meant to dispose of all issues in dispute.").  The Court's Judgment granted Plaintiffs all of the injunctive relief and damages their Amended Complaint requested.  *See* Judgment at 1 & 2 [Dkt. No. 196] (permanently enjoining Defendants from unilaterally terminating or modifying the health care benefits of the Plaintiff Class, ordering Defendants to restore the Plaintiff Class to the level of benefits they enjoyed before the 2009 unilateral changes, and awarding Plaintiffs damages with interest as set forth in the Stipulation for Damages [Dkt. No. 134]).

Since Plaintiffs received all the relief they requested on the merits of their ERISA claim, Plaintiffs are prevailing parties and are eligible to be awarded attorneys' fees and costs under ERISA.

### a.   The *Quesinberry* Factors Weigh in Favor of an Award of Attorneys' Fees

District courts in the Fourth Circuit must justify the award or denial of attorneys' fees in an ERISA case in terms of the five *Quesinberry* factors.  *Quesinberry*, 987 F.2d at 1029.  Those factors are:  (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants or beneficiaries of an ERISA plan, or to resolve a significant legal question regarding ERISA itself; and (5) the relative merit of the parties' positions. *Id.* "This five factor approach is not a rigid test, but rather provides general guidelines for the

district court in determining whether to grant a request for attorneys' fees." *Id.*  In this case, the five *Quesinberry* factors weigh in favor of awarding attorneys' fees and expenses.

### 1.   Degree of Opposing Party's Culpability or Bad Faith

"Culpability" and "bad faith" require more than "mere negligence or error," *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 641 (4th Cir. 1995), but Volvo's actions that motivated this lawsuit meet and surpass this threshold.

As the trial record established, Volvo is a corporation with a record of breaking promises to the unionized employees – and later retirees – of the New River Valley Assembly Plant.  In 2005, despite the contractual language and clear understanding between the union and company negotiators, Volvo refused to raise the amount of the caps set out in the 1999 cap letter.  *See* Exhibit 5 (Plaintiffs' Exhibit 42); Exhibit 4 at 2:22–3:11; 4:25–5:3; 20:21–25 (Trial Transcript March 25, 2010) (Trial Testimony of Stan Ellspermann).  Volvo's conduct was not any better in 2009, when it unilaterally modified the terms of the unionized retirees' health benefits despite the language of the 2005 Benefits Agreement indicating that Volvo could only charge the retirees a pre-defined premium <u>if</u> the cost of such benefits exceeded the cap amounts, the VEBA was projected to be depleted within a calendar year, <u>and</u> Volvo and the union were unable to agree on modifications that would keep the cost of the health plan beneath the caps (or the union failed to meet).  *See* Exhibit 6 (Plaintiffs' Exhibit 80).  This language, as recognized by Volvo's 2005 lead negotiator Greg Tinnell, described the only circumstances under which Volvo could unilaterally amend the retired workers' benefits. Exhibit 3 at 58: 4-14; 60:4-9; 87:12-89:8 (Trial Transcript March 24, 2010) (Deposition

Excerpts of Greg Tinnell).  That restriction was intended to survive the expiration of the
2005 CBA, as communicated by 2005 Union lead negotiator Tim Bressler to Volvo's
Director of Benefits Kaye McLeod, regarding the deletion of the durational language in
the "Cost" paragraph of section 12(a).  *See* Exhibit 7 (Plaintiffs' Exhibit 70); Exh. 3 at
94: 7-14 (Trial Transcript March 24, 2010) (Trial Testimony of Kaye McLeod); Exhibit 2
at 222:22- 223:25; 247:23-249:19 (Trial Transcript March 23, 2010) (Trial Testimony of
Tim Bressler).  Volvo accepted the union's request to delete this language, and Ms.
McLeod – who sat at counsel table for the entire trial and twice took the stand – did not
dispute Mr. Bressler's account of the conversation or that the language in the cost
paragraph was understood to survive the expiration of the agreement.  Finally, in 2009
Volvo also broke its promise – which was a provision agreed in collective bargaining to
end the 2008 strike – to meet with UAW and bargain in good faith in an effort to create a
"big" VEBA Trust that would assume Volvo's obligation to provide health care for
retirees.  Exhibit 8 at ¶¶ 15, 16 (Declaration of Michael Saggau) ("Saggau Decl.").[4]

As established by the trial testimony of Willard Beck, Volvo is a corporation with
top executives who think that it should not have to pay for retiree health care – that would
rather shoot the racehorses that no longer run – but that, nonetheless, entered into a series
of collective bargaining agreements with an open-ended promise to pay the full cost of
health benefits for its New River Valley employees in retirement.  *See* Exhibit 2 at
215:24-216:12; 217:22 - 219:8 (Trial Transcript March 23, 2010) (Trial Testimony of
Willard Beck).  New River Valley Personnel Director Sam Levy described these as

---

[4] At trial the Court sustained Defendants' objection to this evidence, as it was not relevant to the questions
posed to the jury. Exh. 2 at 261:12-266:19 (Trial Transcript March 23, 2010).  This evidence, however, is
relevant to the question the Court now considers, which is whether Volvo acted in bad faith with respect to
the retirees' benefits.

lifetime benefits in new employee orientations held in the late 1970s, and continued to
make these statements at orientations held in the late 1980s, after Volvo had bought the
plant. *See* Exhibit 1 at 172:15-173:1 (Trial Transcript March 22, 2010) (Trial Testimony
of Walter Viers); Exh. 2 at 2:22-3:11; 6:1-7:9 (Trial Transcript March 23, 2010) (Trial
Testimony of George Epperly); Exh. 3 at 99:8-101:3 (Trial Transcript March 24, 2010)
(Trial Testimony of John Sayers).  Volvo's negotiators accepted the union's description
of these benefits as "for life" during the 1991 negotiations.  Exh. 2 at 76:10-77:17; 85:19-
86:17 (Trial Transcript March 23, 2010) (Trial Testimony of Curtis Cox) (interpreting
Plaintiffs' Trial Exhibit 25).  Volvo's manager of Employee Relations, Bruce Jennings,
also conducted exit meetings starting in 2000 where he told retiring employees that their
health benefits "would go on from now on."  Exh. 3 at 101:4-102:7; 156:22-157:5 (Trial
Transcript March 24, 2010) (Trial Testimony of John Sayers and Bruce Jennings).[5]

Yet Volvo willfully disregarded even its own prior statements by unilaterally
modifying the Class members' health benefits and simultaneously filing a suit asking for
a declaratory judgment.  As was so clearly expressed in Plaintiffs' Trial Exhibit 84,
which Volvo's 2005 and 2008 negotiator Jack Widman testified referred to retiree health
benefits, Volvo saw the unions' stated views that Volvo should be held to its health care
promises as a "challenge."  *See*  Exhibit 9 (Plaintiffs' Exhibit 84); Exh. 4 at 47:13-17;
133:17-136:6 (Trial Transcript March 25, 2010) (Trial Testimony of John Widman).

---

[5] At trial Mr. Jennings denied that he had ever told any Class members that their health benefits would last
for life, but he also made the improbable assertion that, in the over 300 exit meetings held before the start
of litigation, no retiring employee or spouse has ever asked how long their health benefits last.  Exh. 3 at
157:10-159:4; 233:10-16 (Trial Transcript March 24, 2010) (Trial Testimony of Bruce Jennings).  Mr.
Jennings further admitted that it is "very reasonable" to think that if no one had asked that question, it was
probably because the employees at the New River Valley Assembly Plant understood that their health
benefits in retirement last for life.  *Id.* at 233:17-20.

When that challenge loomed expensive and large, Volvo resorted to self-help and simply ignored its contractual obligations.

Nonetheless, even if this Court were to find that Volvo did not act with bad faith, the first *Quesinberry* factor still weighs in favor of an award of attorneys' fees because Volvo's actions were culpable. *Phillips v. Brink's Co.*, No. 2:08CV00031, 2009 WL 3681835 at *2 (W.D. Va. Oct. 31, 2009) (J. Jones). Culpable conduct is "blameworthy or involving breach of duty . . . but normally involves something more than simple negligence." *Id.* (internal quotations omitted). As explained above, Volvo willfully ignored its contractual duty to provide collectively bargained retiree health benefits to the Plaintiff Class. Its actions were thought through and planned out, and plainly amounted to more than mere negligence.

## 2.   Ability of Opposing Parties to Satisfy an Award of Attorneys' Fees

Defendant Volvo is a subsidiary of The Volvo Group, a "leading supplier of commercial transportation solutions" based in Sweden but whose manufacturing operations producing trucks, buses, construction equipment, and components for boats, industrial applications, and aircraft, span the globe. *See, e.g.,* Exhibit 13 at iii, 125-26 (Excerpts from 2009 Annual Report for The Volvo Group) (listing Group companies in North America, Western and Central Europe, Brazil, Turkey, India and South Africa). The Volvo Group's assets at the end of 2009 were valued at 332.265 trillion Swedish kronor, or over 43.450 trillion U.S. dollars, and it reports losses in only two of the last eleven years. *Id.* at 72 (listing the average exchange rate applicable in 2009), 131-32.

The Volvo Group's annual report includes descriptions of legal matters in which its subsidiaries are involved. *Id.* at 99. Nonetheless, in its annual report covering the

year 2009, The Volvo Group's report did not mention the *Quesenberry* case separately. *Id.* Instead, in the Legal Proceedings section it made this statement: "Volvo is involved in a number of other legal proceedings. Volvo does not believe that any liabilities related to such proceedings are likely to entail any risk, in the aggregate, of having a material effect on the financial condition of the Volvo Group." *Id.*

### 3. Whether an Award of Attorneys' Fees Against the Opposing Parties Would Deter Other Persons Acting Under Similar Circumstances

An award of attorneys' fees in this case would send a clear message to other employers in similar circumstances that corporations cannot willfully disregard the language and intent of their collective bargaining agreements on retiree health benefits, even where such acts would be financially expedient.

### 4. Whether the Parties Requesting Attorneys' Fees Sought to Benefit All Participants or Beneficiaries of an ERISA Plan or to Resolve a Significant Legal Question Regarding ERISA Itself

The Named Plaintiffs here not only sought to benefit all the participants and beneficiaries of the Volvo Plan of retiree benefits who were affected by Volvo's unilateral changes in 2009; they succeeded in doing so.

Plaintiffs also obtained the Court's ruling on a significant legal question that had not previously been answered in the Western District of Virginia: whether the intent to vest retiree health benefits that are collectively bargained must be proved by "clear and convincing" evidence, as Volvo unsuccessfully argued. *See* Final Jury Instructions at Instruction No. 2 [Dkt. No. 193].

### 5. Relative Merit of the Parties' Positions

Volvo's position is that the collective bargaining agreements it entered into with UAW and Local 2069 do not contain any clear language vesting the right to retiree health care against unilateral changes, and that any rights expired when the CBAs expired. Volvo's legal argument regarding the requirement of clear language was rejected by the Court under the Fourth Circuit's holding in *Keffer v. H.K. Porter Co.*, 872 F.2d 60 (4th Cir. 1989). *See* Report and Recommendation at 18-20 [Dkt. No. 119]; Order [Dkt. No. 158]. As explained *supra* at 5-7 (discussing Volvo's bad faith), the history of bargaining also did not support Volvo's position. The merits of Plaintiffs' position are therefore stronger.

Based on the weight of the *Quesinberry* factors, the District Court should therefore exercise its discretion and award the Plaintiffs attorneys' fees.

### b.  No special circumstances would render an award unjust.

Although no presumption exists in favor of ERISA plan participants or beneficiaries who prevail on their claims, "in order to effectuate the remedial purposes of ERISA, a prevailing individual beneficiary should ordinarily recover attorney's fees unless special circumstances would render such an award unjust." *Quesinberry*, 987 F.2d at 1029 (internal quotation omitted). The purpose of this rule is to advance "the remedial purposes of ERISA to protect employee rights and to secure effective access to federal courts." *Id.* That purpose requires an award of attorneys' fees in the instant case. Named Plaintiffs and Class members are retired assembly plant workers and their dependents, most of whom are on a fixed income. No individual retiree affected by Volvo's actions could have financed this suit. Indeed, it is doubtful that even the entire retiree Class in the aggregate could have afforded competent legal representation against a global

corporation in this case.  Each retiree's share of the attorneys' fees and expenses Plaintiffs have incurred would be more than $2400. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Class Certification at 8 [Dkt. No. 51].

The Plaintiff Class was therefore fortunate to have a union that was willing and able to advance the fees and expenses that made this litigation possible.  Without UAW, the rights of the New River Valley Assembly Plant retirees could have gone unenforced. The costs associated with this suit, however, are very significant for UAW, a non-profit organization.  *See* Exhibit 10 at ¶ 17 (Declaration of Julia Penny Clark) ("Clark Decl."). Moreover, the enforcement of collectively bargained retiree health benefits should not depend on fortune, or on the size and viability of the union that previously represented the retirees.


In sum, the caselaw in the Fourth Circuit supports the exercise of discretion to award Plaintiffs reasonable attorneys' fees in this case.


## II.     Under the Lodestar Method, $948,658.75 is a Reasonable Award of Attorneys' Fees in this Case

Once the Court has determined that it will award the Plaintiffs attorneys' fees, the next step is to determine the appropriate amount.  To do so, the courts in the Fourth Circuit use the Lodestar method: multiplying the number of attorney hours reasonably expended on the matter by a reasonable hourly rate.  *See Phillips v. Brink's Co.*, No. 2:08CV00031, 2009 WL 3681835 at *4 (W.D. Va. Oct. 31, 2009) (J. Jones) (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174 (4th Cir. 1994)); *see also Christian*

*v. Dupont-Waynesboro Health Care Coverage Plan*, 12 F. Supp. 2d 535, 538 (W.D. Va. 1998).

The Lodestar calculation, as well as the identification of both the reasonable number of attorney hours and reasonable hourly fee, is informed by consideration of the twelve *Johnson* factors. *Rum Creek*, 31 F.3d at 175 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986). Those factors are 1) the time and labor required by the case, 2) the novelty and difficulty of the questions involved, 3) the level of skill required to perform the legal service properly, 4) the preclusion of other employment by the attorney due to acceptance of the case, 5) the customary fee, 6) whether the fee is fixed or contingent, 7) the time limitations imposed by the client or the circumstances, 8) the amount involved and the results obtained, 9) the experience, reputation, and ability of the attorneys, 10) the 'undesirability' of the case, 11) the nature and length of the professional relationship with the client, and 12) awards in similar cases. *Rum Creek*, 31 F.3d at 175.

In this case, the *Johnson* factors support plaintiffs' request for 3755.8 hours as a reasonable number of attorney hours expended, and $400 per hour for firm members with more than 30 years of experience, $270 per hour for associate attorneys with more then 3 years of experience, $225 per hour for associate attorneys with less than 3 years of experience, and $125 per hour for work done by paralegals as reasonable hourly rates, for a total Lodestar figure of $948,652.50.

      a.   <u>Time and Labor Required</u>

The time and labor Plaintiffs' counsel invested in this case is detailed in the Declaration of Julia Penny Clark, Plaintiffs' lead counsel, which is submitted as Exhibit

10 to this memorandum.  *See* Exh. 10 at ¶¶ 12, 13 (Clark Decl.).   Ms. Clark exercised

billing judgment throughout the litigation and deducted over 300 hours to account for

duplication of efforts and the relative inexperience of Plaintiffs' counsel Kimberly

Sánchez, who was in her first year of practice at the time she was assigned to this case.

*Id.* at ¶ 11.  In preparation for submitting this fees petition, Ms. Clark again reviewed the

hours previously billed and deducted more than 40 additional hours that consisted of

work done by attorneys who had only minimal involvement in the case, and work that

could have been characterized as more clerical than paralegal.  *Id.* at ¶ 12.  After those

adjustments, the total number of attorney hours expended on this case is 3,755.8.  *Id.*[6]

This figure includes the attorney hours spent litigating over the proper venue for

this case.  Volvo chose to file its original Complaint in the Middle District of North

Carolina, where its headquarters are located.  *See id.* at ¶ 24.  This venue, however, was

highly inconvenient for the Named Plaintiffs and the retiree Class, most of whom live in

or near Dublin, Virginia.  *See* Defendant UAW and Local 2069's Brief in Support of their

Motion to Dismiss, or in the Alternative, to Transfer Venue (M.D. N.C. Feb. 13, 2009)

[Dkt. No. 10].  A far away venue would have also presented difficulties for Plaintiffs'

witnesses who are current Volvo employees at the assembly plant.  *See id.*  Plaintiffs

therefore expended a considerable number of attorney hours to prepare and brief a motion

to dismiss the North Carolina case or transfer it to the Western District of Virginia, before

---

[6] For the convenience of the Court, Ms. Clark's declaration places the work done in the case into categories that broadly describe the particular phase of the litigation that the work supported (i.e. case development and filing Complaint, Motion to Dismiss or Transfer filed in M.D. N.C., Motion to Dismiss or Transfer filed by Volvo in this Court, Motion for Preliminary Injunction, Class Certification, Fed. R. Civ. P. 26(f) and Initial Disclosures, Discovery, legal issues re merits other than in connection to Summary Judgment, Motions for Summary Judgment, Response to Motion to Strike Jury Demand, Stipulation for Damages, Amended Pleadings, client communications, Responses to Defendants' Motions in Limine, trial, and preparation of this Petition for Fees) at ¶ 15.  The time reported is until March 31, 2010.  Plaintiffs will submit a supplemental application for fees for the preparation of this petition at that time, along with work responding to Volvo's Motion to Correct Judgment [Dkt. No. 209]. *Id.*

Volvo agreed to a joint motion to transfer that case to this Court.  *See* Defendant UAW and Local 2069 Motion to Dismiss or, in the Alternative, to Transfer (M.D. N.C. Feb. 13, 2009) [Dkt. No. 9]; Defendant Walter McGrady Jr.'s Motion to Dismiss (M.D. N.C. Feb. 26, 2009) [Dkt. No. 12]; Joint Motion to Transfer Venue (M.D. N.C. Mar. 20, 2009) [Dkt. 18].

The total number of hours also reflects the work-intensive discovery and summary judgment process, which extended from July to late December, 2009.  Exh. 10 at ¶¶ 24-29 (Clark Decl.).  During this period Plaintiffs produced to Defendants 14,848 pages of documents that they had identified from a much larger volume of potentially responsive documents collected from union offices and archives, and even individual negotiators' homes.  *Id.* at ¶ 25.  From September 1 through October 23, 2009, Plaintiffs' counsel also prepared for, travelled, and took or defended nineteen depositions in locations from New River Valley to Detroit and Dallas.  *Id.* at ¶ 28.

Immediately following the last deposition on October 23, Plaintiffs' counsel turned their attention to the upcoming deadline for filing summary judgment motions: November 30, only 37 days away.  *Id.* at ¶ 29.  Plaintiffs worked intensely through both the Thanksgiving and the Christmas Holiday period to file their motion for summary judgment, a response to Volvo's motion for summary judgment, and a reply to Volvo's response to plaintiff's motion. *Id.*  Shortly after the New Year, on January 4, Plaintiffs also responded to Volvo's motion to strike Plaintiffs' jury demand. *Id.* at ¶ 30.

Finally, the total number of hours takes into account Plaintiffs' concentrated efforts to respond to Volvo's motions in limine, and prepare for, and then conduct the five-day trial.  *Id.* at ¶¶ 31, 32.

b.  <u>Novelty and Difficulty of the Questions</u>

The proof of Plaintiffs' case was both novel and difficult.  This is because, as a breach of retiree benefits case premised on the language of collective bargaining agreements spanning more than 25 years, this case was heavily fact-dependent.  No two collective bargaining agreements are ever the same, and neither are the people or the circumstances involved in collective bargaining.  It was necessary to investigate, discover, and develop trial evidence that was sufficient to prove what the bargaining parties intended in their early agreements, as well as in the 2005 agreement.  Several key participants in those negotiations were deceased – including Sam Levy and Gary Hamrick, who both died while the case was pending.  Other key negotiators had no recollection of discussions pertaining to retiree health care.  *See* Exh. 3 at 234:12-235:3; 254:7-260:25 (Trial Transcript March 24, 2010) (Trial Testimony of George Marik); Exhibit 4 to Memorandum in Opposition to Defendants' Motion in Limine to Strike Witnesses from Plaintiffs' Witness List at ¶ 31 [Dkt. No. 144] (describing the lack of recollection of Elliott "Andy" Anderson).  The inability to present testimony from these witnesses made the development of evidence a greater challenge.

c.  <u>The Skill Requisite to Perform the Legal Service Properly</u>

To competently represent the interests of the 430 retiree Class members required the skills of a litigator experienced in retiree health benefits class actions.  This is because, due to the small amount of precedent in the Fourth Circuit regarding breach of collectively bargained retiree health benefits, Plaintiffs' counsel needed to be well versed in the national caselaw on retiree benefits under the LMRA and ERISA, and to develop from all the available information the kinds of facts that would be useful to prove the

intent of the parties in their collective bargaining agreements.  Counsel's knowledge was also essential to effectively marshal such facts and craft the legal arguments presented in response to Volvo's summary judgment motion.  Finally, extensive litigation experience was clearly necessary for trial where Plaintiffs' legal and factual arguments ultimately prevailed.  It is highly doubtful that an attorney less experienced in any of these areas – knowledge of retiree benefits jurisprudence, litigation, or class action management – could have produced the results obtained by Plaintiffs' counsel, and certainly not within the abbreviated time frame in which this case was adjudicated.

d.   <u>The Preclusion of Other Employment by the Attorney Due to the Acceptance of the Case</u>

This case required an unusually intensive effort from counsel for a period of more than one year.   As a result, it was very difficult for Plaintiffs' lead counsel Ms. Clark to address the needs of her other clients from July 2009 to the end of trial.  Exh. 10 at ¶ 33 (Clark Decl.).  Ms. Clark's clients include eleven employee benefit funds that routinely call on her for general legal advice, attendance at trustees' meetings, drafting legal documents, and other non-litigation tasks. *Id.*  On a number of occasions from July 2009 to the end of trial, when Ms. Clark was not available, other attorneys at Ms. Clark's firm stepped in to fulfill these clients' needs. *Id.* Where this was not a reasonable option, some clients took their urgent business to other firms with whom they also had a relationship, and Ms. Clark's firm thus lost work that would have been paid at higher rates than UAW's rates.  *Id.* at ¶ 34.

e.   <u>The Customary Fee</u>

Under the Lodestar approach the hourly rate for legal services must be reasonable. *Blum v. Stenson*, 465 U.S. 886, 888 (1984).  This requirement is satisfied by applying the

prevailing market rate.  *See Rum Creek*, 31 F.3d at 175.  Several elements are relevant to determination of the market rate.

As a starting point, "[m]arket rates may be proved by the rate which clients normally and willingly pay the petitioning attorneys."  *Id.*  Plaintiffs' counsel request that the Court grant them attorneys' fees at the following hourly rates: $400 per hour for attorneys with over 30 years of experience, $270 per hour for associate attorneys with over 3 years of experience, $225 per hour for associate attorneys with less than 3 years of experience, and $125 per hour for paralegals.  These rates are within the range of rates that Plaintiffs' lead counsel Ms. Clark regularly charges clients and is paid for her services.  Exh. 10 at ¶ 16 (Clark Decl.).

Other fee awards to the petitioning attorneys are also useful evidence of market rates.  Ms. Clark has been awarded attorneys' fees in ERISA actions at a higher hourly rate than the rate Plaintiffs seek here.  In January of 2009, the District Court for the Eastern District of Michigan awarded Ms. Clark attorneys' fees in retiree health benefits cases brought against General Motors Corp., Ford Motor Co., and Chrysler at the following rates: $475 for firm members with more than 20 years' experience, $290 for experienced associates, $250 for less experienced associates, and $125 for paralegals.  *Id.* at ¶ 16.  Ms. Clark's services in those cases were compensated at a rate of $475 per hour. *Id.*

Prevailing rates in the legal community are also useful to establish market rates for the services of an attorney in that community.  Although the community where the court sits is usually the appropriate reference point for setting the prevailing market rate, "the complexity and specialized nature of a case may mean that no attorney, with the

required skills, is available locally." *Hanson*, 859 F.2d at 317.  Where that is the case, counsel for the prevailing party may collect attorneys' fees at their home market rates if they meet a two-part test.  *See Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009).  "First, tribunals should ask if extrajurisdictional counsel rendered services that were truly available in the visited market. . . .  Second, tribunals should ask if the party that hired extrajurisdictional attorney chose reasonably, or whether they chose an unnecessarily expensive attorney."  *Id.*

        As explained *supra* at 15-16, this was a case that required a retiree health benefits specialist with ample experience in litigation and class actions.  A recent search of the Martindale-Hubbell database, however, revealed no attorneys in Abingdon who identified themselves as retiree benefits or ERISA specialists.  *See* Exhibit 14 (Martindale-Hubbell Search Results).  In addition, although the initial complaint was filed in the Middle District of North Carolina, from the outset the UAW wanted to consider litigating the case in the Western District of Virginia – where the New River Valley Assembly Plant is located and where almost all of the retirees live.  But Volvo's case was pending in Greensboro, and UAW wanted its counsel to be able to handle all aspects of the case no matter where they transpired.  Exh. 8 at ¶ 12 (Saggau Decl.).  UAW had a longstanding relationship – almost 20 years of similar cases – with Ms. Clark and her firm.  Plaintiffs acted reasonably in engaging Ms. Clark's services based on her status as a retiree benefits specialist with ample experience in litigation and class actions, *id.* at ¶ 21, on the positive outcomes she had previously secured for UAW, *id.* at ¶¶ 5-11, and on the reputation of both Ms. Clark and the firm for doing high-quality work, *id.* at ¶ 10.  *See also* Exh. 10 at ¶¶ 7-8 & Exhs. A, B (Clark Decl.).

Plaintiffs' requested rates are not unnecessarily expensive.  Indeed, they are below market rates for federal litigation in Washington D.C.  The United States Department of Justice maintains and regularly updates a database – called the "*Laffey* Matrix" – that is accepted as evidence of Washington D.C. market rates for federal litigation.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995).  The Fourth Circuit has also accepted the *Laffey* Matrix as "a useful starting point to determine fees."  *Newport News Shipbuilding*, 591 F.3d at 229.  Under the *Laffey* Matrix, the prevailing market rates in Washington D.C. for 2009-2010 are $465 per hour for attorneys with over 20 years of experience, $270 per hour for attorneys with over 3 years of experience, $225 per hour for attorneys with less than 3 years of experience, and $130 per hour for paralegals.[7]

Plaintiffs' requested rates are also recognized as reasonable by Washington, D.C. practitioners.  Peter Buscemi is a large-firm litigator with over 30 years of experience practicing in the District of Columbia.  Exhibit 11 at ¶ 3 (Declaration of Peter Buscemi) ("Buscemi Decl.").  Mr. Buscemi also has considerable experience litigating LMRA and ERISA matters, and is familiar with Ms. Clark's work.  *Id.* at ¶ 4, 7.  In Mr. Buscemi's considered view, the rates requested by Plaintiffs' counsel "are well below the high end of market rates for employee benefits lawyers practicing in the Washington, D.C. area."  *Id.* at ¶¶ 5, 6, 8.[8]

---

[7] There also exists a *Laffey* Matrix updated by a private sponsor under which market rates are identified as $686 per hour for attorneys with over 20 years of experience, $349 per hour for attorneys with over 3 years of experience, $285 per hour for attorneys with less than 3 years of experience, and $155 per hour for paralegals.  The difference is the index used to adjust the rates for inflation.  *See* Laffey Matrix, http://www.laffeymatrix.com/see.html (last visited May 3, 2010).

[8] Plaintiffs also needed limited services of local counsel and seek attorneys' fees for their work. In the Middle District of North Carolina Plaintiffs retained  J. Griffin Morgan, whose hourly rate is $350 per hour. A declaration from Mr. Morgan detailing his experience and establishing the reasonableness of his rate is appended as Exhibit 12.  In the Western District of Virginia Plaintiffs retained James Montgomery, whose

In this case UAW was charged reduced hourly rates that are below the rates that the firm charges to some of its other clients and below the rates that are prevalent in Washington, D.C.  Exh. 10 at ¶ 17 (Clark Decl.).  The firm charges lower rates to UAW because UAW is nonprofit organization whose goals and values are consistent with those of Plaintiffs' counsel.  *Id.*

Nonetheless, under *Blum v. Stenson*, 465 U.S. 886 (1984), Plaintiffs' counsel is entitled to receive attorneys' fees at the prevailing market rate.  As the Supreme Court there stated, "'reasonable fees' . . . are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel."  *Blum*, 465 U.S. at 895; *National Wildlife Federation v. Hanson*, 859 F.2d 313, 319 (4th Cir. 1988); *Miele v. N.Y. State Teamsters Conference & Pension Fund*, 831 F.2d 407, 407-08 (2d Cir. 1987) (applying *Blum* in an ERISA context).  In *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517 (D.C. Cir. 1988), *Blum*'s holding was specifically extended to private counsel who charge certain clients below-market rates in order to advance a non-pecuniary cause.  This was done to prevent what the D.C. Circuit termed "an anomaly."  *Id.* at 1520.  Otherwise, as now Justice Ruth Bader Ginsburg noted:

> [t]he highly paid commercial, for-profit law firm can receive awards equal to its usual handsome rates.  The legal aid attorney, tied to the prevailing market rate analysis of *Blum*, . . . can . . . receive the awards consistent with those of "the highest paid law firm in town." . . .  But attorneys whose practice partakes of some elements of each of those two entities will receive fee awards often significantly smaller than those calculated on the common basis of the other two.

hourly rate is $200, to serve as local counsel until Ms. Clark's application for admission to the District Court for the Western District of Virginia was granted.  See Exhibit 15 (Invoice from James Montgomery).

*Id.* (internal quotation omitted).  For those reasons, fees should be awarded at market rates, as requested here, rather than at the discounted rates that UAW was charged.

### f.   Whether the Fee is Fixed or Contingent

As we have described, UAW agreed to advance counsel's fees at a discounted rate during the course of litigation with the understanding that if Plaintiffs succeeded, counsel would apply to the Court for an award of fees at the prevailing market rates.  Exh. 10 at ¶¶ 18, 20, 21 (Clark Decl.).  Any amount the Court awards in fees will be first applied to reimburse UAW for what it has already paid for the work covered by the award.  *Id.* at ¶ 18.  The arrangement between Plaintiffs' counsel and UAW is therefore in the nature of a partial contingency fee.

### g.   Time Limitations Imposed by the Client or the Circumstances

Plaintiffs' counsel understood that this case should be resolved as quickly as possible to avoid excessive hardship on the retiree Class.  *Id.* at ¶ 22.  Many, if not most, Class members are dependent on their retirement pension and are on a fixed income.  Counsel feared some Class members would forgo necessary health care or endure other hardships due to their inability to pay for the increased health care costs Volvo's unilateral changes imposed on them.  *Id.*; *see* Report and Recommendation at 28-33 [Dkt. No. 38].   Plaintiffs' counsel therefore worked at every stage of this litigation to reach a favorable resolution as quickly as possible.

### h.   The Amount Involved and the Results Obtained

As set out *supra* at 3-4, Plaintiffs prevailed on the merits of both their LMRA and ERISA claims and received all of the injunctive relief and damages they requested in their Amended Complaint.  *Compare* Judgment at 1 & 2 [Dkt. No. 196] (permanently

enjoining Defendants from unilaterally terminating or modifying the health care benefits of the Plaintiff Class, ordering Defendants to restore the Plaintiff Class to the level of benefits they enjoyed before the 2009 unilateral changes, and awarding Plaintiffs damages with interest as set forth in the Stipulation for Damages [Dkt. No. 134]) *with* Amended Complaint at 11-12 [Dkt No. 72].  Plaintiffs' counsel have thus secured excellent results.

Although the changes to retiree health care that Volvo unilaterally implemented in 2009 had a profound effect on the members of the retiree Class, to determine the exact monetary amount that was at stake in this lawsuit would require information and calculations that are not possible on the record or other evidence available to Plaintiffs. Pursuant to the Stipulation for Damages [Dkt. No. 134], Volvo will ultimately reimburse each Class member for the excess health care costs he or she incurred while Volvo's unilateral changes were in effect.  For Subclass A retirees who are not yet eligible for Medicare, such damages include the $30 monthly premium per covered person that Volvo instituted on March 1, 2009, plus additional amounts they had to pay in copayments, deductibles, and co-insurance.  For Subclass B retirees who are Medicare-eligible, damages will cover the out-of-pocket health care costs they incurred under the Health Reimbursement Arrangement ("HRA") Volvo forced on them. The collectively-bargained health benefits that Class members will continue to receive – and which Volvo cannot now unilaterally modify or terminate – have a far greater value, but the evidence in the record does not assign a dollar value to these future benefits.

i.   The Experience, Reputation and Ability of the Attorneys

Bredhoff & Kaiser ("B&K") is "one of the best known and most highly respected labor law firms in the country representing unions and employees." Exh. 8 at ¶ 10 (Saggau Decl.); *see* Exh. 11 ¶ 7(Buscemi Decl.) ("Bredhoff and Kaiser has a national reputation in the field of labor law and employee benefits."). Though small in size, B&K is well-known for its high-quality work and successful outcomes. *See* Exh. 8 at ¶ 10 (Saggau Decl.); Exh. 11 ¶ 7(Buscemi Decl.); Exh. 10 at ¶ 7 (Clark Decl.). Bredhoff & Kaiser has been recognized in legal publications, most recently in the January 2009 issue of *American Lawyer*, where it was named one of the "top litigation boutiques of the year." *See* Exh. 10 at ¶ 7 (Clark Decl.).

Plaintiffs' lead counsel Ms. Clark is an employee benefits specialist with over 30 years of experience. *Id.* at ¶ 9. Ms. Clark has successfully litigated other retiree health benefits class action suits. *Id.* at ¶¶ 4-5; Exh. 8 at ¶¶ 6-9 (Saggau Decl.). Ms. Clark graduated with highest honors from the University of Texas Law School in 1973, and served as law clerk to Judge J. Braxton Craven, Jr., of the United States Court of Appeals for the Fourth Circuit, and Associate Justice Lewis F. Powell, Jr., of the United States Supreme Court. Exh. 10 at ¶ 9 (Clark Decl.). She was recently recognized by *Super Lawyers* magazine for being one of the "Top Attorneys" in Washington, D.C., specializing in Employee Benefits/ERISA. *Id.* at ¶ 8.

Other B&K attorneys who served as Plaintiffs' counsel are graduates of Columbia, Yale, Harvard, Stanford, and Berkley (Boalt Hall); served as law clerks in the United States Courts of Appeals; and focus their practice on representing employees and labor unions in the federal courts and other forums. *Id.* at ¶ 9.

A summary of the background of each of the attorneys involved in this case can be found at paragraph 9 of Ms. Clark's declaration.

> j.   The "Undesirability" of the Case

Remunerated at Plaintiffs' counsel's prevailing home market rates, it is unlikely this case would be undesirable to many qualified attorneys.  This would not be the case, however, if fees were set at below-market rates.

> k.   The Nature and Length of the Professional Relationship with the Client

Counsel's firm, Bredhoff & Kaiser, has represented UAW since at least the early 1990s when Ms. Clark litigated a retiree health benefits case with heavy equipment manufacturer Navistar.  Exh. 10 at ¶ 4 (Clark Decl.); Exh. 8 at ¶ 6 (Saggau Decl.).  Since then, Ms. Clark has represented UAW in repeat litigation over retiree health benefits with General Motors Corporation, Ford Motor Company, and Chrysler, and defended UAW against claims filed by Caterpillar, Inc., and CNH America LLC regarding past retiree health benefits agreements.  Exh. 10 at ¶ 4 (Clark Decl.); Exh. 8 at ¶¶ 7, 9 (Saggau Decl.).

> l.   Awards in Similar Cases

In a recent ERISA case brought to enforce the rights of a single retiree, *Phillips v. Brink's Co.*, No. 2:08CV00031, 2009 WL 3681835 (W.D. Va. Oct. 31, 2009), Judge Jones awarded attorney Richard F. Hawkins III, of Richmond, Virginia, $39,780.94 in fees and $3,794.55 for expenses, including travel, where Mr. Hawkins secured partial summary judgment against the employer.  *Phillips*, 2009 WL 3681835 at *1, *6.  At the time of this award, Mr. Hawkins was an ERISA practitioner with 13 years of experience. *See* Richard F. Hawkins, III – Lawyer Profile, http://www.martindale.com/Richard-F-Hawkins-III/1748952-lawyer.htm (last visited May 3, 2010).  Judge Jones calculated the

fee award applying a $275 hourly rate for work done by Mr. Hawkins in 2009.  *Id.* at *5.

*Phillips* is therefore in line with a fee award of $400 per hour to Ms. Clark where Ms.

Clark is a recognized specialist in employee benefits with over thirty years of experience.

*See also Cook v. Jones & Jordan Eng'g, Inc.*, No. 5:06-cv-00627, 2009 WL 3169152, at

*1, *7 (S.D. W.Va. Sept. 29, 2009) (awarding $100,503.70 in attorneys' fees, with a

maximum hourly rate of $295 per hour, to Plaintiffs' counsel based in Charleston, West

Virginia, for work on an ERISA case that settled before trial); *Croy v. E. Hall & Assocs.,*

*P.L.L.C.*, No. 5:06-cv-00107, 2007 WL 676698, at *1, *3, (W.D. Va. Mar. 2, 2007)

(awarding attorneys' fees at a rate of $375 per hour for a Fair Debt Collection Practices

Act case that settled though an offer of judgment).


### III.    The Court Should Also Award Plaintiffs Reasonable Expenses

As the Fourth Circuit has acknowledged, "[l]itigation expenses such as

supplemental secretarial costs, copying, telephone costs and necessary travel are

integrally related to the work of the attorney and the services for which outlays are made

may play a significant role in the ultimate success of litigation . . . ."  *Wheeler v. Durham*

*City Bd. of Educ.*, 585 F.2d 618, 623-24 (4th Cir. 1978).  The Fourth Circuit has therefore

held that a fee award may include expenses in addition to the costs that can be recovered

under 28 U.S.C. § 1920.  *See Daly*, 790 F.2d at 1084.   Because an award of expenses

would also advance "the remedial purposes of ERISA to protect employee rights and to

secure effective access to federal courts," *Quesinberry*, 987 F.2d at 1029, the Plaintiffs

respectfully request the Court grant them expenses in the amount of $98,948.92.  Exh. 10 at ¶¶ 22, 23 (Clark. Decl.).[9]

### CONCLUSION

On the grounds set forth above, Plaintiffs' respectfully request that their motion for attorneys' fees and expenses in the amount of $1,047,601.42 be granted.

Respectfully submitted,

_s/ Julia Penny Clark_
JULIA PENNY CLARK (Virginia Bar 48175)
jpclark@bredhoff.com
KIMBERLY SÁNCHEZ OCASIO (_pro hac vice_)
ksanchez@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC  20005
(202) 842-2600

DANIEL W. SHERRICK (Michigan Bar P37171)
dsherrick@uaw.net
MICHAEL F. SAGGAU (Michigan Bar P35326)
msaggau@uaw.net
8000 East Jefferson Avenue
Detroit, MI  48214
(313) 926-5216

_Counsel for Plaintiffs_

May 3, 2010

---

[9] For the Court's convenience, Ms. Clark's declaration breaks down expenses by category at ¶ 15.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2010, I electronically filed the foregoing Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees and Expenses with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Lindsey H. McGinnis
Matthew J. Hank
Robert C. Drake
Thomas J. Bender
LITTLER MENDELSON, P.C.
1650 Tysons Blvd. Suite 700
McLean, VA 22102
lmcginnis@littler.com

Attorney for Defendants

Respectfully submitted,

_s/ Julia Penny Clark_
JULIA PENNY CLARK (Virginia Bar 48175)
jpclark@bredhoff.com
KIMBERLY SÁNCHEZ OCASIO (_pro hac vice_)
ksanchez@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC  20005
(202) 842-2600